Emory M. SHOFNER, Plaintiff,

v.

ILLINOIS CENTRAL RAILROAD COMPANY, Defendant.

No. G–C–30–60.

United States District Court
N. D. Mississippi,
Greenville Division.

Oct. 28, 1960.

———◆———

John C. Webb, Philip Mansour, Greenville, Miss., for plaintiff.

W. C. Keady, Roy Campbell, Jr., Farish, Keady & Campbell, Greenville, Miss., for defendant.

CLAYTON, District Judge.

This is a suit by Emory M. Shofner against Illinois Central Railroad Company by which plaintiff seeks to recover for personal injuries suffered and property damage sustained by him when his automobile collided with a standing freight train of defendant between 2:30 and 3:00 o'clock a. m. on August 1, 1959. This case was tried to the court, sitting without a jury, on complaint and answer.

1) This collision occurred when the weather was clear and warm at a crossing of defendant's single line of railway and Mississippi Highway No. 1 in the outskirts of Greenville, Mississippi. At this place the highway runs generally North and South, while the railway runs generally Northeast and Southwest, with the small angles formed by the intersection of the center lines of the highway and railway being slightly less than 58 degrees.

2) This is a four lane highway with a median strip down the middle dividing two South bound lanes from two North bound lanes. Each side, between the median strip and the edge of the highway, consists of 24 feet of concrete surface extended by 10 feet of bituminous surface. Approaching this grade crossing from both the North and the South, the grade of the highway rises gently—almost imperceptibly—over a long distance, making the railway tracks at a slightly higher elevation than the highway in both directions. From a point 700 feet North of the crossing there is a rise of five and eleven one-hundredths feet to the crossing and from a point 700 feet South thereof there is a rise thereto of four and ninety-two one-hundredths feet.

3) Plaintiff approached from the North, traveling South in the right (West) lane for use of South bound traffic. His automobile was a 1959 Super 88 Oldsmobile in almost new condition. It had been purchased by plaintiff about five months before the collision and had been driven about 7,000 miles. Plaintiff was alone in the automobile, and its headlights were on. There is a dispute as to whether these lights were on "low beam" or "high beam" and it is undisputed in this evidence that on high beam the lights of this automobile produced 92,000 candle power and would light a man in dark clothing 280 feet to the front, while the low beam produced 28,000 candle power and would light a man in dark clothing 195 feet to the front. Plaintiff testified that his lights were on low beam, and his evidentiary position makes this evidence more persuasive.

4) There is some conflict about the speed at which plaintiff was driving, but the preponderance of the evidence shows that he was not exceeding 45 miles per hour (the posted speed limit for this zone), and, that he did not decrease this speed before the impact.

5) Defendant's employees were engaged in switching a cut of 34 freight

cars and this train had stopped on this crossing no more than three minutes before the collision and was motionless when struck. The point of impact was in the right, outside or West lane of the two lanes for South bound traffic and was against a truck of a boxcar, consisting of four solid wheels mounted on two axles. Thus, it is clear that substantially all of the space from the tracks to the bottom of the freight car, in plaintiff's lane of traffic, was actually occupied by these wheels as he approached and drove into this train. The "low beam" lights of his automobile undoubtedly shone on these wheels at least 195 feet away. At the time of the collision and for a few minutes prior thereto, another automobile, with its parking lights and tail lights burning, was halted in the inside, left or East lane, of the two lanes for South bound traffic, a few feet North of the track, waiting for the train to clear this crossing. Hence, there was little, if any, appreciable space, beneath the freight car, in the lane being used by plaintiff.

6) The highway at this crossing, in 1957 and early 1958, was converted from a two lane to a four lane roadway, with median strip down the middle, as has been described. This conversion did not change the grade of the highway, and, except for the noted changes, this grade crossing remained in substantially the same condition. At all times pertinent to this case, electrically operated red signal lights were installed and maintained by defendant North and South of this crossing, on the West side of the highway facing South bound traffic and on the East side of the highway facing North bound traffic. Each of these installations consisted of two lights, mounted seven feet above the ground, on a steel pole or standard which was twelve feet in height. Each of these two lights had a round red lens 8⅜ inches in diameter facing oncoming traffic and a white lens facing in the opposite direction. Below the two lights, facing oncoming traffic and attached to the pole or standard was a sign "Stop on Red Signal". Above the lights, near the top of the pole or standard, was a sign in the form of an X on which appeared the words "Railroad Crossing". The light installation with which we are primarily concerned, the one facing South bound traffic, was located 15 feet 11 inches West of the pavement and 19 feet ½ inch from the nearest rail of the track. North of this light installation there was a standard "Mississippi Law Stop" sign, 22 feet West of the edge of the pavement and 37 feet 10 inches North of the North rail, measured parallel to the West edge of the pavement. Measured at right angles to the Northern line of the defendant's right-of-way, the distance from the nearest rail was 32 feet 9 inches. Section 7775, Mississippi Code 1942, requires that such signs shall be located fifty feet from each grade crossing.

7) The aforementioned red signal lights were automatically placed in operation as a train or cut of cars approached this crossing on defendant's track. At some distance from the crossing, a switch, as there was movement on the track above it, turned these lights on and they would stay in operation for only a short time, unless the train or cut of cars then moved on closer to the crossing, where there were other switches that would place the lights in continuous operation as long as the train or cars remained on or near the crossing. As the train or cars moved away from the crossing these or similar switch installations would cut the lights off. Thus, these lights would sometimes be in operation when the crossing was not actually occupied by any rolling stock of defendant, but the lights would always operate when such rolling stock was in close proximity to the crossing or actually occupying any part thereof.

8) At night, when these lights were in operation, they could be seen for great distances along the highway, which, for a long distance on each side of this grade crossing, is almost straight. When the lights were operating, they would alternately flash or blink at a rate of from 40 to 45 times a minute. These lights

were so operating before and at the time of the collision and had been so operating for more than three minutes before the impact.

9) Slightly more than 700 feet North of this crossing, on the West edge of the highway facing South bound traffic, there was located a standard circular Mississippi State Highway Department reflector type sign, with yellow background and black lettering and marking, warning that there was a railroad crossing ahead.

10) Before this collision, while this grade crossing was in substantially the same condition as it was in the early morning hours of August 1, 1959, except for the widening aforementioned, at least fifteen similar collisions occurred during the hours of darkness. One other such collision occurred during the same time, but it is not shown whether it was during darkness or not. Two other such collisions occurred on August 2 and August 19, 1959. Proof of these collisions was made by introduction of properly authenticated copies of the reports of these accidents filed by defendant, with the Mississippi Public Service Commission as is required by Section 7865, Mississippi Code of 1942. Objection was made by defendant to all of this evidence and specific objection was made to the reports of these accidents which happened before the highway was widened and to the reports of the two such accidents which happened after August 1, 1959. Ruling on these objections was reserved. Clearly, accidents which happened after the one in question here, could not serve in any way as notice to defendant of the condition of this grade crossing on August 1, 1959, nor could it be said that they would have any evidentiary value with respect to the condition of this grade crossing at the time of the collision in question. Therefore, defendant's objection to the reports of these subsequent accidents is sustained. However, the rule in Mississippi, sustained by the weight of authority elsewhere, is that evidence of prior accidents is admissible both as to notice and as to the condition of the locus in quo. S. H. Kress & Co. v. Markline, 117 Miss. 37, 77 So. 858; City of Meridian v. Akin, 193 Miss. 505, 10 So.2d 194; Evans v. Pennsylvania Railroad Co., 3 Cir., 1958, 255 F.2d 205, 70 A.L.R.2d 158 (followed by an annotation) and Atlantic Coast Line R. Co. v. Hadlock, 5 Cir., 1950, 180 F.2d 105. The objection of defendant to this evidence, having to do with accidents which occurred before August 1, 1959, is overruled and these reports will be and are considered by the court as showing the character of the grade crossing in question and notice thereof to defendant.

11) Several witnesses, two of whom were experienced patrolmen with the Mississippi Highway Safety Patrol, who knew this crossing, testified in substance that on approaching this crossing at night at a reasonable rate of speed, in an automobile with good headlights burning, even with the red warning lights aforementioned in operation, because of the almost imperceptible grade of the highway rising to the crossing, the height of the bottom of freight cars above the highway, and other conditions surrounding this grade crossing, they could see beyond a train standing on this crossing, or moving across it, and observe headlights of oncoming cars and tail lights of cars going away, and sometimes could see the glow of the lights of the City of Greenville beyond the train so that, altogether, sometimes an illusion thereby arose that there were no freight cars standing on the grade crossing or no train moving across it. This effect, they said, was enhanced by the fact that freight cars are generally painted with a dark, light absorbing color, that quite often these cars would have their sliding doors open, and that automobile headlights are sometimes focused so that the main area of brightness therefrom would go below the bottom of the freight cars. Other witnesses testified that when they approached this crossing at night, when the red warning lights were operating, and when they were moving at a speed not in excess of the local zoned

limit of 45 miles per hour, with the headlights on their automobile working properly, they had no difficulty in seeing either standing cars or a train moving across this crossing at night. At least one of these witnesses testified that the flashing red warning lights on the North of this crossing as aforementioned could be seen at least three miles away. After this collision, in preparation for this trial, defendant undertook to duplicate substantially the condition which existed on the North side of this grade crossing at the time of the collision by stopping a train on this crossing, with the truck at the West end of one of the cars directly in the right or West lane for South bound traffic on this highway, and by parking an automobile in the left or East lane, of the two lanes for South bound traffic, and having these conditions observed from varying distances North of the crossing and on the highway. The parked automobile had its parking lights on and its tail lights were burning. Another automobile, with its headlights burning, was placed, headed North, in the right or East lane for North bound traffic, South of the crossing. This evidence came in without objection and the purport of it, resulting from these tests, is that an observer in an automobile, with proper headlights, could not see anything under the standing freight cars that would cause any confusion and that headlights of South bound automobiles would shine on the standing freight cars at a distance more than ample for the stopping of an automobile driven no faster than 45 miles an hour. Some of these witnesses did testify that they saw, while at a substantial distance from the crossing, tail lights of automobiles receding South of the crossing, headlights of North bound automobiles, South of the crossing, and a blinking highway traffic light a substantial distance South of the crossing. These witnesses were all well aware, before their part in such tests began, of all of the surroundings and the fact that a train was actually on this crossing. Hence, what they saw cannot be fairly compared to what would be seen by an ordinary motorist not especially concerned with checking or testing conditions of visibility, who had not been prewarned that a train was actually on the crossing.

12) Plaintiff testified that he turned into this highway at the junction therewith of a road leading to the Greenville Air Force Base, which he said was about three to four miles from this grade crossing and that he then drove to the crossing at a speed of no more than 45 miles per hour with his headlights on "low beam", and hit the train without seeing it. He admitted that he saw none of the several prominent landmarks along the route, that he did not recall seeing the Highway Department warning sign, or the flashing red warning lights, or the "Mississippi Law Stop" sign, all aforementioned. He did not notice the stopped automobile in the adjoining lane or its tail lights, nor did he see the box car or the large white lettering on the side of it facing him in his traffic lane. He did say that he saw headlights of an automobile approaching the crossing from the South, in the part of the highway for North bound traffic. He was familiar with this grade crossing, saying that he drove this route about one month going daily to and from the Greenville Air Force Base. He said that he had crossed over this grade crossing from two to five times at night, that he could not specifically say he had ever seen the red warning lights at any time and that he had never, before this collision, seen freight cars or a train at this crossing, although he estimated that he had driven over it from 40 to 60 times.

13) In the early part of the evening before this collision, plaintiff visited the Officers Club at the Greenville Air Force Base, where he had three or four highballs and ate bar type hors d'oeuvres. He joined in a card game between 9:00 and 10:00 o'clock and said he had no drinks thereafter. This game ended a few minutes before the collision, at which time he started on his unfortunate journey.

14) The general duty of a railroad company with respect to its grade

crossings in Mississippi is set forth in opinions of the Supreme Court of Mississippi in such cases as Bentz v. Louisville & N. R. Co., 183 Miss. 563, 184 So. 448; Buffington v. Gulf & S. I. R. Co., 186 Miss. 132, 188 So. 563; and Gordon v. Illinois C. R. Co., 190 Miss. 789, 1 So.2d 772, as follows:

"A railroad company is not required to maintain a crossing whereat no injury is possible. The rule is similar to that in regard to municipal streets, and thus the obligation of the railroad company is that it shall exercise reasonable care to so maintain a public crossing that it may be reasonably safe for the use of persons who in such use exercise reasonable care for their own safety."

Pursuant to the foregoing, the long established general rule, to which the Supreme Court of Mississippi is firmly committed, is that the presence of a train, or railroad cars, for legitimate business purposes, on a grade crossing, is, of itself, sufficient warning to motorists approaching such crossing. Gulf, M. & N. R. Co. v. Holifield, 152 Miss. 674, 120 So. 750; Gulf, M. & N. R. Co. v. Kennard, 164 Miss. 380, 145 So. 110; Spilman v. Gulf & S. I. R. Co., 173 Miss. 725, 163 So. 445; Gulf M. & N. R. Co. v. Addkison, 189 Miss. 301, 194 So. 593; Mississippi Export R. Co. v. Summers, 194 Miss. 179, 11 So.2d 429, (Suggestion of Error overruled 194 Miss. 179, 11 So.2d 905).[1] All of these were cases of automobile collisions during darkness (or, in one case, fog) with standing freight cars or a standing train. In all of them liability of the railroad company was denied although in at least one case there was no stop sign (Gulf, M. & N. R. Co. v. Addkison, supra) and in at least one the cars were flat cars (Spilman v. Gulf & S. I. R. Co., supra). And,

there were no flashing red warning lights at any of them, or even a man with a lighted lantern.

15) A now well established exception to this general rule, foreshadowed by statements thereof in some of the cited cases, and applied in the case of Boyd v. Illinois C. R. Co., 211 Miss. 409, 52 So.2d 21, 22 is that where conditions and circumstances are such that the company's employees know, or in the exercise of reasonable care should know, that a person driving on the highway at a reasonable speed in an automobile properly equipped with lights and brakes, exercising reasonable care, may not be able to see cars in time to avoid a collision therewith, then the railroad company must provide, in addition to the physical presence of the cars or train on the crossing, warning commensurate with the circumstances and the reasonably foreseeable danger. Plaintiff bottoms his case on this exception and places great reliance on Boyd v. Illinois C. R. Co., supra, and the authorities cited there. But, that case is distinguishable in a number of significant ways from the case now before this court. There were no flashing red warning lights at the crossing there involved; the car actually occupying the crossing was an empty flat car, used for transporting pulpwood, and its center was approximately upon the center of the crossing, but the wheels (or trucks) on each end were entirely off of the traveled portion of the crossing so that " * * * underneath this car that part of the railroad track upon the highway was not obscured in any manner, and from one side of the highway to the other the only obstruction was the floor of the car and the side of a sill about .15 or 18 inches in height upon which the flooring rested and iron rods about one inch in diameter which braced and supported the sill; * * *." There was

---

1. Compare Magers v. Okolona, Houston & Calhoun City R. Co., 174 Miss. 860, 165 So. 416, and Illinois Cent. R. Co. v. McNeil, 205 Miss. 807, 39 So.2d 490, which were decided on the proposition that the crossings were not occupied or obstructed for legitimate railroad purposes. There

is no dispute here. The occupancy was unquestionably for legitimate purposes. And, see also Illinois Cent. R. Co. v. Sanders, 229 Miss. 139, 90 So.2d 366 involving a moving train and physical obstruction to view of the crossing.

also present on the approach to that crossing an appreciable dip in the highway which caused the driver to get a late view of the car since his lights were deflected by the dip. Additionally, the driver was looking for the "Mississippi Law Stop" sign which was not there at all. The action of the Supreme Court in that case was to hold that the trial court was in error in instructing a verdict for the railroad company, and the case was remanded for a trial before a jury. The effect of this disposition was simply to hold that it was a question of fact for determination by a jury as to whether the above stated exception applied, and, if so, whether the railroad company had exercised the care required by that situation. Insofar as can be learned, this exception has never been applied at a crossing where flashing red warning lights were in operation.

16) To sustain plaintiff's main position, it would be necessary to find from a preponderance of the evidence that defendant was guilty of some negligence, with respect to precautions taken to warn plaintiff that a train was on this crossing and that this negligence was a proximate cause of the collision. This court cannot so find. Assuming, arguendo, that this crossing, intermittently, is so situated that at times a motorist exercising reasonable care driving upon this highway at a reasonable rate of speed, approaching this crossing in an automobile properly equipped with headlights, might not be able to see freight cars standing on this crossing or moving across it, but might be faced with an optical illusion that no cars were standing or moving across it, this is not shown to be the situation immediately before plaintiff drove his automobile into defendant's train. Plaintiff did not see the flashing red warning lights at any time, although he probably could have done so from the time he entered the highway if he had looked. He did not see the Highway Department sign, a great distance North of the crossing. He did not see the automobile stopped facing in his direction of travel near the crossing in the

lane to his left. He did not see any of the prominent landmarks along his route of travel on the highway. There could not have been any illusion with respect to the presence of the trucks (wheels) of the freight car on the track in plaintiff's lane of travel or with respect to the aforesaid stopped automobile, the tail lights and parking lights of which were burning. If there was any illusion of any kind, it would have been with respect to the North bound portion of the highway, in which plaintiff saw one set of headlights South of the tracks. He saw nothing in his own South bound part of the highway. It would be conjecture and speculation to say that he would have seen a warning device of any other kind. It seems safe to say that the probabilities are that he would not have seen any such device. It, therefore, seems logical, from all of the evidence in this case, to find that this crossing, and the conditions surrounding it immediately before this collision, did not present to defendant such a situation as would invoke the exception to the rule aforementioned so as to require extraordinary precautions to be taken by it. The case might have been different for a motorist not familiar with the crossing who did observe the Highway Department sign, the flashing red warning lights, the "Mississippi Law Stop" sign and the stopped automobile in the adjoining lane of traffic, if the trucks of the freight car had not been present in his lane and if he had seen under the train, *in his own lane of traffic,* headlights of oncoming automobiles and tail lights of automobiles going away so that, altogether, he had a positive illusion that the track was not occupied by a train.

17) Plaintiff also claims that the position of the stop sign, less than fifty feet North of the tracks, in violation of the statute was negligence which proximately contributed to this collision and that, therefore, without regard to any negligence on the part of plaintiff, there is liability on the part of defendant. But, that is not the case here. Plaintiff knew of this crossing and was familiar with

it. Under the general rule aforementioned that the presence of the train on the crossing was sufficient notice and warning, it cannot be said that the location of this sign had any causal connection with the collision. Gulf M. & N. R. Co. v. Addkison, supra; New Orleans & N. E. R. Co. v. Burge, 191 Miss. 303, 2 So.2d 825, 826; Columbus & Greenville R. Co. v. Robinson, 189 Miss. 675, 198 So. 749. In the Burge case, the Court said:

" * * * It is not enough in any case merely that the defendant was negligent. The failure to ring the bell or blow the whistle does not of itself impose liability. If it did, then a man stone-deaf with nobody in sight of him could recover. The statute does not so attempt, even if it could constitutionally do so—however much upon a casual approach there may be a feeling to the contrary. In this, as in all cases, it is necessary to a cause of action on account of the negligence that the latter shall have been the proximate, or a contributing, cause of injury to another; and in order that it shall be a proximate or contributing cause it must have been a substantial factor in producing the injury. And an actor's negligent conduct is not a substantial factor in bringing about harm to another if it would have been sustained even if the actor had not been guilty of the particular negligence charged. 2 Restatement, Torts, § 432. The foregoing statement is particularly applicable in those cases where the actor's negligence consists in the failure to take certain precautions which are required by law for the protection of another's person or chattels, of which the requirement to ring the bell or blow the whistle at public crossings is an example. In such a case, if the same harm, both in character and extent, would have been sustained even had the actor taken the required precautions, his failure to do so is not even a perceptible

factor in bringing it about and cannot be a substantial factor in producing it. 2 Restatement, Torts, p. 1162.

" * * * Or to put it otherwise, if the evidence discloses that it was highly probable that the injury would still have occurred had there been no negligence on the part of the defendant, the latter's negligence is not to be allowed as a proximate or a contributing cause. 2 Restatement, Torts, p. 1164.

"To say on the record in the present case that had the required signals been given the injury would not have occurred is to invoke a possibility or conjecture, and it is not within the legitimate province or power of a jury to convert a possibility into something more by the mere force of a verdict. Teche Lines, Inc. v. Bounds, 182 Miss. 638, 649, 179 So. 747. To thus convert, what, on the facts, is no more than a possibility into something more would be to allow an arbitrary exercise of power by an agency employed in government, and in that connection due process must be remembered as a primary constitutional mandate. In view of what is disclosed by this record taking all the plaintiff says as true together with the undisputed physical fact it is clear as a matter of all reasonable likelihood that appellee would not have heard the bells if two instead of one had been rung. *The facts amount practically to a demonstration that he was both deaf and blind to everything except what he himself was doing, his sensibilities were in an evident state of unresponsiveness to all else;* and thus the failure to ring the bell—and that was all the appellant was required to do—disappears as a substantial factor in bringing about the injury; hence appellee cannot recover." (Emphasis added.)

18) Plaintiff also bases his claim of negligence on the allegation that defend-

ant failed to give the statutory bell and whistle signals in violation of § 7777, Mississippi Code 1942. It is without dispute that these signals were given before the engine moving the cut of cars entered this crossing, but it may be that these signals were not being given at the time of the collision. Even if this were true, it would avail nothing for plaintiff since the crossing was fully occupied by the cars of this train and none of them were moving at the time, or immediately before, the impact.

"Since, therefore, the entire crossing was occupied by the railroad cars and had been for a sufficient length of time for a person to see them and to stop before colliding therewith, the said presence of the cars was all the warning thereof that was required, and thereupon the statutory warning by bell and whistle became relegated to the position of actual and legal remoteness, with the result that the failure to give the statutory signals became the remote, and not the proximate,

cause, and that the negligence of the plaintiff was the sole proximate cause of the collision, as was held by the learned trial judge. Any other conclusion would lead to the result that, to avoid the charge of concurrent negligence, the whistle would have to be sounded or the bell kept ringing continuously all the while that any part of a train is upon the crossing, regardless of the length of time thereof. * * *" Spilman v. Gulf & S. I. R. Co., supra [173 Miss. 725, 163 So. 446].

■ 19) The statutes of Mississippi required plaintiff's automobile to be equipped with lights as specified thereby.[2] This was that the "upper beam" would "reveal persons and vehicles at a distance of at least 350 feet ahead"[3] and that a change to the "lower beam" should be made only when there was "an oncoming vehicle within 500 feet".[4]

Under Mississippi cases, and cases in other jurisdictions a motorist must keep

---

2. "§ 8229–01. Required lighting equipment on vehicles.
"(a) When vehicles must be equipped. Every vehicle upon a highway within this state during the period from a half hour after sunset to a half hour before sunrise and at any other time when there is not sufficient light to render clearly discernible any person on the highway at a distance of five hundred (500) feet ahead shall be equipped with lighted front and rear lamps as in this section respectively required * * *."

3. "§ 8229–11. Multiple-beam road-lighting equipment.
"Except as hereinafter provided, the head lamps or the auxiliary driving lamp or the auxiliary passing lamp or combinations thereof on motor vehicles other than a motorcycle or motor driven cycle shall be so arranged that the driver may control the selection between distributions of light projected to different elevations, subject to the following requirements and limitations:
"(a) There shall be an uppermost distribution of light, or composite beam, so aimed and of such intensity as to reveal persons and vehicles at a distance of at least 350 feet ahead for all conditions of loading.

"(b) There shall be lowermost distribution of light, or composite beam so aimed and of sufficient intensity to reveal persons and vehicles at a distance of at least 100 feet ahead; and on a straight level road under any condition of loading none of the high-intensity portion of the beam shall be directed to strike the eyes of an approaching driver. * * *"

4. "§ 8229–12. Use of Multiple-beam road-lighting equipment.
"(a) Whenever a motor vehicle is being operated on a highway or shoulder adjacent thereto during the times specified by law, the driver shall use a distribution of light, or composite beam, directed high enough and of sufficient intensity to reveal persons and vehicles at a safe distance in advance of the vehicle, subject to the following requirements and limitations:
"(b) Whenever the driver of a vehicle approaching an oncoming vehicle within five hundred (500) feet, such driver shall use a distribution of light or composite beam so aimed that the glaring rays are not projected into the eyes of the oncoming driver."

his car under such control as will permit him to stop within the range of vision afforded by his lights. Frazier v. Hull, 157 Miss. 303, 127 So. 775; Rhodes v. Fullilove, 161 Miss. 41, 134 So. 840; Jackson City Lines v. Harkins, 204 Miss. 707, 38 So.2d 102, 104; United States F. & G. Co. v. McCullough, 5 Cir., 202 F.2d 269, and Atlantic Coast Line R. Co. v. Kammerer, 5 Cir., 205 F.2d 525. Thus, plaintiff was negligent in driving with the "lower beam" of his headlights and when he did so, he was bound to be able to stop his automobile within the range of vision afforded by these lights selected by him. His inattention, his failure to watch and to see that which he ought to have seen and his complete absorption with something other than his responsibility as a driver made him blind to everything which, in the exercise of reasonable care he should have seen. In Mississippi Export R. Co. v. Summers, supra, in referring to sections of Chapter 200, Laws 1938, the pertinent portion of which is brought forward as (b) paragraph 3, § 8176, Mississippi Code 1942, the Supreme Court of Mississippi said [194 Miss. 179, 11 So.2d 430]:

"* * * That the driver of a motor vehicle 'when approaching and crossing an intersection * * * when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions, and speed shall be decreased as may be necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the highway.'"

"The authorities referred to simply mean that the railroad company had the right to assume that Summers was complying with the law. If he had been, it is manifest that the collision could not have occurred. The only warning due him was the presence of the boxcar seen in ample time to stop. The comparative negligence statute has no application because the negligence of Summers was the sole proximate cause of his death * * *."

Here, plaintiff knew this crossing and should have decreased his speed as he approached it.

20) It is manifest here that had plaintiff complied with the law, exercised reasonable care and kept his automobile under reasonable control, the collision in question could not have happened. Thus, the sole proximate cause of the collision here and the resulting personal injuries to plaintiff and property damage to his automobile was the negligence of plaintiff.

The complaint should be and is dismissed.