**Helen LIDY, Plaintiff-Appellant,**

v.

**FILM TRANSIT, INC.,
Defendant-Appellee.**

No. 86–4018
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Aug. 6, 1986.

John H. Cocke, Merkel & Cocke, Clarksdale, Miss., for plaintiff-appellant.

Lawrence D. Wade, Campbell & Delong, Greenville, Miss., for defendant-appellee.

Before GEE, REAVLEY and ROBERT MADDEN HILL, Circuit Judges.

**OPINION**

ROBERT MADDEN HILL, Circuit Judge:

Terry Pinegar was driving a newspaper truck on a dark, moonless night on an unlighted two-lane highway in the rural Mississippi delta. A vehicle from the opposite direction approached, and both vehicles dimmed their lights. Just before they

passed, Pinegar noticed a dark, motionless object immediately ahead in his lane. As he passed over it, Pinegar realized to his horror that it was the body of a man lying on the dark asphalt. In this wrongful death action the district court found no negligence on the part of Pinegar, and we affirm.

## I.

The body on the highway was later identified to be that of Charles Edwin Lidy. How Lidy came to be there is a mystery.[1] Lidy had just completed the work release requirement of his parole from the Mississippi State Penitentiary at Parchman by working for a farmer near Drew, Mississippi. On Saturday, June 27, 1981, the farmer met Lidy in Drew and gave him his final paycheck, which Lidy cashed that day. A friend drove him to nearby Tutwiller, Mississippi, at about 6:00 p.m., where Lidy told the friend "I believe I will walk up to the store," which was half a block away from the friend's house. The friend never saw Lidy again.

Lidy was next seen walking south on U.S. Highway 49 in front of Parchman penitentiary sometime after midnight, approximately ten minutes from Tutwiller. A guard at the main gate spoke to Lidy, whose shirt and shoes were in his hand, mud smeared over the upper part of his body and his pants. Lidy explained his appearance by saying that "his" car had broken down and he had been trying to repair it. The guard did not know it, but Lidy did not own a car. Lidy asked for a ride into Drew, but the guard declined, telling him he was working in a state vehicle. The guard recalled that Lidy showed no signs of intoxication. Lidy and the guard parted, and Lidy resumed walking south along the highway towards Drew.

That night Terry Pinegar was driving a six-wheeled "bob truck," delivering the Sunday edition of a Memphis newspaper for his employer, Film Transit, Inc. ("Film Transit"). With him in the front seat was James Saulsberry, also a Film Transit employee.[2] They had left Memphis at about 8:30 or 9:00 p.m. and reached Parchman from the north at about 1:00 or 1:15 a.m. They dropped their papers at Parchman and continued south along Highway 49, their headlights on high beam. Highway 49 runs straight for about four miles south from Parchman to Drew. The posted speed limit is fifty-five miles an hour.

Pinegar accelerated as he left Parchman, up-shifting gears. He saw another vehicle ahead coming from the opposite direction with its high beam headlights on. Pinegar and the other vehicle both dimmed their lights. As was his custom while driving at night past an approaching vehicle, Pinegar glanced slightly towards the right shoulder of the road to avoid being blinded by the oncoming lights. Just prior to the point where the two vehicles converged, Pinegar noticed a low, dark object lying across his lane about two or three car lengths ahead. Pinegar recalled that at this point either he was just about to or he had just shifted into fifth gear. Pinegar estimated his speed at between fifty and fifty-five miles an hour, while Saulsberry estimated forty-five to fifty.

Pinegar recalled that he was unable to avoid striking the object. As he passed over the object, he realized that it was the body of a black male lying supine with arms extended and hands tucked under the small of the back. Pinegar did not apply the brakes, but Saulsberry recalled him swerving in an effort to avoid striking the body. Both men felt a bump. Pinegar, described by Saulsberry as "in a state of shock," decided to try to get help. Pinegar

---

1. We relate this evidence in the interest of completeness. The district court did not address the question of contributory negligence since it found Pinegar not negligent. Because we affirm the finding of no negligence on Pinegar's part, we also need not solve the mystery of Lidy's presence in the road.

2. Saulsberry testified that he was showing the route to Pinegar, while Pinegar testified that he was showing the route to Saulsberry. In any event, both men had had some experience on this route.

did not stop, continuing south into Drew to notify the police. He met no other vehicles on the way.

Clyde Mitchell was a truck driver going north on U.S. Highway 49 from Drew in the early morning hours.[3] He was speeding, doing eighty to ninety miles an hour, when he saw a vehicle up ahead approaching from the opposite direction. Mitchell first thought it was a highway patrolman, and slowed to fifty-five. Both vehicles dimmed their lights. The vehicles passed, and then Mitchell noticed a "log" in the other lane. Switching his lights to high beam, Mitchell slowed further, and saw that it was the body of a man. Fearing some sort of ruse by a Parchman escapee, Mitchell did not stop but continued north. He stopped at the Parchman gate and alerted the guards.

A highway patrolman arrived on the scene, approximately a mile and a half south of the Parchman gate, and found Lidy dead, lying across the southbound lane. Lidy had suffered a massive head injury. His shirtless and barefoot body was still covered with mud. No money was found in Lidy's pockets. The patrolman noticed that the body was not reflective and provided no contrast with the dark asphalt. Despite the strange circumstances of Lidy's presence in the road, an autopsy was neither requested nor performed. However, visual examination of the body did not reveal the presence of other wounds which might have indicated the possibility of an alternative cause of death. The local coroner opined that Lidy was alive when struck by the vehicle, based on the large amount of blood found on the surface of the highway.

Lidy's mother Helen, on behalf of herself and the beneficiaries of Lidy's estate, brought a wrongful death action against Film Transit, alleging that Pinegar was negligent. Jurisdiction was based on diversity of citizenship. The parties agreed that Mississippi law controls. After a bench trial, the district court concluded that Lidy was apparently alive when the Film Transit truck struck him, but found that Pinegar was not negligent. The court dismissed the suit, and Helen Lidy appeals.

## II.

■ A district court's finding on a negligence question, as other issues of fact, is to be tested by the clearly erroneous standard of Fed.R.Civ.P. 52(a). *See McFarland v. T.E. Mercer Trucking Co.*, 781 F.2d 1146, 1148–49 (5th Cir.1986); *Ladnier v. Norwood*, 781 F.2d 490, 493 (5th Cir.1986). *See also McAllister v. United States*, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed.2d 20 (1954); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2590 (1971). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985).

■ Helen Lidy seeks to avoid the application of this standard by contending that Pinegar was negligent per se in violating two provisions of Mississippi law.[4] Other

---

**3.** As we relate below, some evidence indicated that Mitchell was the driver Pinegar passed just after he encountered Lidy in the road. However, the district court concluded from Mitchell's description of the vehicle approaching him that it was not Pinegar's truck. We need not review this finding, since our holding does not rely on the resolution of this factual issue.

**4.** Violations of traffic laws may constitute negligence as a matter of law. *See U-Haul Co. v.*

*White*, 232 So.2d 705, 708 (Miss.1970). "In order to capitalize on the violation of a safety statute by a defendant, the plaintiff must establish that he is part of the class of persons which the statute was intended to protect and that the harm suffered was of the kind the statute was designed to prevent ... [as well as] causation between violation of the statute and the harm suffered." *Id.* (citations omitted). Since the district court did not find a statutory violation,

grounds of negligence alleged in the complaint were abandoned at trial and not raised on appeal. First, she contends that Pinegar was negligent for having dimmed the headlights on the Film Transit truck at a point where the relevant Mississippi statutory and case law required the vehicle's high beam headlights be used. Second, she argues that Pinegar, although traveling within the posted speed limits, nevertheless was driving at a negligently excessive speed as a matter of law because he could not stop in front of or otherwise avoid objects within the range of his vision. We deal with each of these contentions in turn.

### A.

Helen Lidy first argues that Pinegar violated a Mississippi traffic statute by dimming his headlights far too early when the oncoming vehicle approached, thereby negligently restricting his field of vision. She interprets a Mississippi statute to prohibit the dimming of lights when an oncoming vehicle is more than five hundred feet away. *See* Miss.Code Ann. § 63-7-33 (1972). She places great emphasis on Pinegar's testimony that about ten seconds elapsed between the moment he dimmed his lights and the point he encountered the object on the road. Taking the highest estimate of Pinegar's speed, fifty-five miles per hour, and assuming the undisputed fact that the oncoming vehicle was at a point

south of the body, she contends that the vehicles must have been separated by well over five hundred feet when Pinegar dimmed his lights.[5] She contends that the district court erred in failing to find this violation of the statute negligence per se. We disagree.

Initially, we note that the statute in question does not expressly state when low beams are *prohibited,* instead providing only when they are *required:*

> Whenever a motor vehicle is being operated on a highway ..., the driver shall use a distribution of light, or composite beam, directed high enough and of sufficient intensity to reveal persons and vehicles at a safe distance in advance of the vehicle, subject to the requirement that whenever the driver of a vehicle approaches an oncoming vehicle within five hundred feet, such driver shall use a distribution of light of composite beam so aimed that the glaring rays are not projected into the eyes of the oncoming driver.

Miss. Code Ann. § 63-7-33 (1972). One federal district judge has in dicta interpreted this statute to the effect that "a change to the 'lower beam' should be made *only* when there was 'an oncoming vehicle within 500 feet.'" *See Shofner v. Illinois Central R.R. Co.,* 188 F.Supp. 422, 430 (N.D. Miss.1960) (emphasis added), *aff'd,* 300 F.2d 188 (5th Cir.1962).[6] However, the

---

it did not pursue these three elements of negligence per se.

5. Film Transit's expert witness testified that a vehicle traveling fifty-five miles per hour is covering about eighty feet each second. Thus, Pinegar's estimate would place him at least eight hundred feet north of the body when he dimmed his lights. Mitchell testified that he came upon the body about two hundred feet after he passed the oncoming vehicle. Mitchell did not estimate the separation distance of the vehicles when they dimmed their headlights. At trial Film Transit's expert was given these assumptions, as well as the assumptions that it actually was Pinegar's and Mitchell's vehicles which passed and that Mitchell was also travelling at a constant speed of fifty-five. The expert calculated that the separation distance of the two vehicles when they dimmed their lights was eighteen hundred feet.

6. The driver in *Shofner,* behind the wheel after "three or four" highballs and a late-night card game, collided with a stationary railroad freight car at a grade crossing, ignoring the flashing red warning lights and the red rear lights of an automobile stopped in the adjoining lane. The district court in *Shofner* found the driver contributorily negligent in his suit against the railroad. No specific mention was made of the doctrine of negligence per se, but the court mentioned that his negligence, in addition to several other acts, consisted in part of driving toward the grade crossing with his headlights on low beam. 188 F.Supp. at 431. The *Shofner* decision also failed to consider the change in the traditional range-of-vision rule announced in *Jester v. Bailey,* 239 Miss. 384, 123 So.2d 442 (1960). *See infra.* On appeal, the panel affirmed, listing several elements of the driver's negligence but omitting any mention of his use of low beams or of the statute. 300 F.2d at 189–90.

statute is also subject to the interpretation that a driver must switch to low beam headlights *no later than* within five hundred feet of an oncoming vehicle, but *may* use low beams sooner if they still "reveal persons and objects at a safe distance in advance of the vehicle." [7] The *Shofner* comment, which cites no Mississippi authority for its interpretation of the statute, would call upon Mississippi motorists to dim their headlights at precisely five hundred feet to avoid a violation of the law. Any miscalculation, however slight, would constitute a criminal act. *See* Miss. Code Ann. § 63–7–7 (1972) (violation of section 63–7–33 a misdemeanor). However, while we are sceptical of such an interpretation, we need not directly confront this issue.

■ Even if Mississippi law does not prohibit the dimming of headlights more than five hundred feet in advance of an oncoming vehicle, the record contains evidence to support a finding that Pinegar did not violate such a prohibition. Saulsberry, Pinegar's passenger, under cross-examination agreed that his estimate of the separation of the vehicles when the headlights were dimmed ranged from "three hundred to five hundred feet." [8] While Saulsberry's contention was an estimate, Pinegar's testimony of a ten-second separation between his truck and the body—which forms a crucial part of the claim of Pinegar's statutory violation—was also no more than an "approximation." In the face of such conflicting testimony, we are unable to determine that the district court clearly erred in giving little credence to Pinegar's rough approximation. The court was not required to disbelieve Saulsberry's estimate any more than it was required to believe Pinegar's. We therefore cannot conclude that Pinegar was negligent per se in the use of his headlights.

### B.

Helen Lidy also argues that, even though all of the testimony supported Pinegar's contention that he was driving within the prevailing speed limit of fifty-five miles per hour, he must be held negligent for driving faster than his range of vision would allow. She relies on an early Mississippi rule that a driver operating a vehicle at a speed which does not permit him to avoid striking objects coming within the range of his headlights is liable for any collisions proximately caused thereby. *See Jackson City Lines v. Harkins*, 204 Miss. 707, 38 So.2d 102 (1948); *Frazier v. Hull*, 157 Miss. 303,

---

High beam headlights must "reveal persons and vehicles at a distance of at least 350 feet," while low beams must do so at a distance of at least 100 feet. Miss. Code Ann. § 63–7–31 (1972). However, section 63–7–33 does not make specific reference to these requirements.

7. Such an interpretation is supported by *Harvey v. Bush*, 252 Miss. 326, 173 So.2d 125 (1965). The *Harvey* plaintiff drove sixty to sixty-five miles per hour on a highway under construction with her lights on dim. 173 So.2d at 127. The jury found her negligence to be the sole proximate cause of a resulting collision with a sand barrier, and the Supreme Court of Mississippi treated her appeal as a challenge to the weight of the evidence, making no mention of any traffic statute. The Supreme Court affirmed, holding that the evidence supported the jury's finding that she had violated the common law duty of "vigilant caution" applicable when driving on a road under construction. *Id.*

8. The exchange between Saulsberry and Helen Lidy's counsel went as follows:
Q. On previous statements, Mr. Saulsberry, and on your deposition, didn't you agree that there was no other traffic at all, that you did

not meet any other cars between Drew and Parchman as you went that way that night?
A. No. If I did, I was probably guessing. Like I said, I was scared and anything, you know— You know, I was probably scared. It is just something—It just does not happen to a person.
Q. I am not asking about being scared, Mr. Saulsberry. I am asking did you not tell that man back in 1981 that there was no other cars or traffic on that road that night other than the one car, and if you do not agree with that, when I took your deposition back in January of 1984?
A. I probably did.
Q. And this one car now, Mr. Saulsberry, I believe that you have testified previously that when you first saw those lights or noticed them and they would dimmed [sic], that that car was—I think you have ranged it from three hundred to five hundred feet away at various times, have you not sir?
A. Well, that is just a rough guess.
Q. Yes, sir. . . .

127 So. 775 (1930). Under this traditional rule, a driver who strikes a vehicle or person in the road commits negligence per se. *See Terry v. Smylie*, 161 Miss. 31, 133 So. 662, 664 (1931). "Whenever [a driver] finds himself so blinded by the lights of another car, or from any other cause, so that he cannot see in front of him a distance within which he can stop his car at the rate of speed he is traveling, he should at once bring his car within such speed." *Id.* (also mentioning a violation of the maximum speed statute). The evidence is uncontradicted that Pinegar did not discern the object in the road until he was unable to avoid it. Thus, Helen Lidy asserts, there is no question but that Pinegar was driving at an excessive and unsafe speed under the conditions. Again, we cannot concur.

█ The range-of-vision rule has been significantly relaxed by a more recent decision of the Mississippi Supreme Court:

> The range-of-vision rule is not an arbitrary rule of thumb to require "infallibility of the nocturnal motorist." The motorist must keep his car under such control that he can stop within the clear and unobstructed distance ahead of him, but in determining whether he should be held responsible, the character, appearance, and visibility of unlighted vehicles parked on the road must be taken into consideration.

*Jester v. Bailey*, 239 Miss. 384, 123 So.2d 442, 445 (1960). The question for the factfinder is "whether [the driver] has reasonable control of his automobile under the circumstances." 123 So.2d at 446. The factor to be weighed in determining negligence may include the driver's speed, his precautions taken to avoid collision, the amount of warning available, the color and height of the vehicle struck, the extent of darkness and haze, and the glare from oncoming vehicles. *Id.* Negligence is not automatically supplied by the mere failure to stop before colliding with an object in the road. *See, e.g., Jones v. Phillips*, 263 So.2d 759, 763 (Miss.1972); *Canton Broiler Farms, Inc. v. Warren*, 214 So.2d 671, 675 (Miss.1968). The district court was correct

in examining the circumstances of the accident rather than automatically assessing liability.

█ The circumstances here amply support the district court's finding of no negligence. There was no moon, and there were no sources of illumination along the road. Pinegar faced the glare of headlights which, although not on high beam, were still brightly shining in the dark night. Lidy was lying flat on the pavement, his body no more than a few inches high. Lidy was covered with mud, and nothing on his body was in any way reflective. Film Transit's expert witness testified that the "backlighting" of Lidy's body by the other vehicle's headlights under such conditions would be ineffective in assisting Pinegar's vision. Pinegar's swerve apparently pulled his front wheels around Lidy without striking him; the fatal impact evidently came from one of the rear wheels. The combination of the oncoming glare and the low, dark object inexplicably positioned in the road set the scene for a tragic accident. Our review of the record, however, does not leave us with the definite and firm conviction that the district court erred in exonerating Pinegar from a negligent role in its happening.

Accordingly, the judgment of the district court is AFFIRMED.