377 So.2d 1055 (1979)
Carrie Bell CANNON, Individually and on Behalf of the Next of Kin of Rubin Cannon, Deceased,
v.
Robbie JONES d/b/a Jones Flying Service and Bobbie Joe Chaney.
No. 51495.
Supreme Court of Mississippi.
November 21, 1979.
Rehearing Denied January 9, 1980.
Fraiser, Burgoon, Henson & Abraham, John J. Fraiser, Jr., Jon M. Barnwell, Greenwood, for appellant.
Upshaw & Ladner, James E. Upshaw, Greenwood, for appellee.
Before SMITH, WALKER and BROOM, JJ.
BROOM, Justice, for the Court:
An airplane, being used in applying herbicides to a rice crop, struck and killed flagman Rubin Cannon. His mother, Carrie Bell Cannon, individually and on behalf of his next of kin, filed suit in the Circuit Court of LeFlore County against airplane pilot Bobbie Joe Chaney, and Robbie Jones d/b/a Jones Flying Service, for whom Chaney was piloting the airplane. The jury, by a nine to three verdict, exonerated Chaney and Jones (defendants herein) and from the adverse judgment, Carrie Bell Cannon appeals. We affirm.
Early on the morning of June 29, 1978, in clear, calm weather, Rubin (aged 19) and his brother Roy (aged 16) were stationed in a rice field as flagmen for aerial applicator pilot Chaney. Rubin and Roy both held tissue in their hand and Chaney could see them as they stood in the field which had a two-foot high levee across the southern boundary with Johnson grass about two feet tall growing on it. Field dimensions are approximately 2,357 feet in length from North to South and 1,000 feet in width from East to West. Because of three separate groups of electric transmission wires crossing it in the East-West direction, the field was what is known as a "wire patch." Pilot-defendant Chaney was disbursing herbicide substance on the rice and in doing so the plane was not to be flown more than three feet above the rice, which was approximately two and one-half feet high. *1056 Pilot Chaney in making application of the herbicide flew on a North-South pattern as he made low-level passes over the field.
In performing their duties, the two flagmen entered the field from the West. Rubin entered the field approximately 200 feet North of the South boundary and Roy made a similar entrance from a point North of Rubin. Their instructions were to take 14 steps and hold their tissues aloft until pilot Chaney "lined up" on them with the airplane prior to making his pass. Then the flagmen were to move to a place of safety by taking 14 additional steps to the side. In performing his spraying activities Chaney would fly from North to South, and after turning then fly from the opposite direction. After having made approximately eleven successful passes earlier that morning, Chaney made a North-South pass and banked his aircraft, which he then lined up on Rubin for a South-North pass. As Chaney started this pass, some 1500 to 2000 feet from the field, it became his responsibility to guide the airplane over the levee and underneath the wires so that he could effectively apply the herbicide. Apparently Chaney lined up for the pass, then he observed Rubin start to move but subsequently did not look for or see Rubin again. After passing over the levee, the aircraft nosed down under the wires and into the field, where it struck and killed Rubin.
Uncontradicted evidence was that Rubin was intelligent and was an experienced flagman with two years work history. His co-worker brother was Roy; also a flagman. Roy saw the tragic occurrence in which Rubin was killed, and testified for the appellant. According to Roy, the accident "never would have happened" if he (Rubin) had stepped "to the East" as instructed. Roy said that even two steps to the East by Rubin would have put Rubin out of the path of the airplane.
Appellant argues that upon the record the appellees made no adequate defense as a matter of law, and therefore the lower court should have granted appellant's request for a peremptory instruction. The appellant points out that at the trial appellee Chaney (called as an adverse witness) testified that he lined up on the flagmen and that they then began moving along (both of them) in a parallel manner. Chaney, as quoted by appellant in her brief, testified as follows:
I was able to see them. Once I line up on the flagman and he moves, I don't bother looking at him anymore. As soon as he starts moving, that's the last thing I look at. I then start looking at the poles and wires and the levee. From the point in which the man first starts moving, I don't watch him again and if that man gets bogged down in the mud, I wouldn't know it because I'm not looking at him, I'm looking at all the other things. It is his problem to get out of the way ...
On this particular day, I took a look at Rubin and saw him flagging and move and then I cast him completely out of my mind because I was worried about those poles, the wires, the levee, keeping the plane level and turning on the juice. I had a lot of things to worry about and I didn't have time to worry about the flagman... .
When the flagman sees the aircraft's wings level, he starts moving. At that point, the aircraft is 1500 to 2000 feet away. Once a flagman makes a movement to get out of the way, I never look at him again. Once he starts to move, he has served his purpose. I don't need to worry about him anymore, and assume he will get out of the way... .
Applicable here are the following:
Mississippi Code Annotated § 61-11-1 (1972), which provides in its pertinent parts:
§ 61-11-1. Reckless operation of aircraft  hunting.
It shall be unlawful for any person ... to operate an aircraft in the air or on the ground or water, in a careless or reckless manner so as to endanger the life or property of another. In any proceeding charging careless or reckless operation of aircraft in violation of this section, the court in determining whether the operation was careless or reckless shall consider *1057 the standards for safe operation of aircraft prescribed by federal statutes or regulations governing aeronautics.
Federal Aviation Administration regulations, § 137-49, which states:
Notwithstanding part 91 of this chapter, during the actual dispensing operations, including approaches, departures, and turn arounds, reasonably necessary for the operation, an aircraft may be operated over other than congested areas below 500 feet above the surface and closer than 500 feet to persons, vessels, vehicles and structures, if the operations are conducted without creating a hazard to persons or property on the surface.
Appellant cites Hays, et al. v. Morgan, 221 F.2d 481 (5th Cir.1955) in support of her position. In Hays, (tried without a jury) a "crop dusting" airplane pilot struck and injured a flagman in much the same fashion as in the case at bar. The Hays opinion states:
... [F]rom the evidence that Fortney was guilty of negligence in the operation of the plane, which caused the accident... .
.....
It is the evident intent of the statute to protect the public from any negligence and financial irresponsibility of pilots. It does not say that one on the ground must assume the risk of being hit by an airplane, but that the owner who authorizes the use of his airplane shall be deemed to be engaged in the operation thereof within the meaning of the statutes of Mississippi.
.....
... The primary standard for airplanes prescribed by federal statutes is careful operation so as not to endanger the life or property of another, which standard was found by the court below to have been violated by the pilot in this case. (221 F.2d at 482).
In the Hays opinion very few facts appear as to the actual operation of the aircraft. It can be clearly seen, however, that the Hays court, as a trier of fact, determined that a violation of the statute had occurred. In the case at bar, it is obvious that the fact trier (jury) did not so find.
Riddell, et al v. Little, 253 Ark. 686, 488 S.W.2d 34 (1972) is factually similar to the instant case in many respects. The Riddell opinion states:
Although there is ample substantial evidence, as we will discuss later, to support appellee's allegation that the crop-dusting pilot was negligent in flying too low, we think the evidence is deficient that Riddell, as a crop-dusting pilot, failed to maintain a proper lookout as alleged in the complaint. To the contrary, it appears that the lookout maintained by Riddell was all that a reasonably careful pilot would or could observe in crop-dusting. He testified that he was looking at the ground and the border levee (where Little was standing) and out both sides of the plane and in all directions during this particular pass toward the flagman when the accident occurred. This testimony is uncontradicted. Another crop duster, who was experienced in the trade, testified as did Riddell that when a plane is flying at the low altitude which is necessary for crop-dusting purposes, a "blind spot" exists which obscures the pilot's vision in front of the plane. It appears that the flagman Little came within this "blind spot" at a distance of approximately 150 to 200 yards as the plane approached him. The plane was flying at approximately 95 m.p.h. and at an altitude of 3 to 6 feet. There is no evidence that a crop-dusting pilot would have been able to maintain any better lookout than did Riddell once the "blind spot" position existed. The more experienced crop duster testified it was his opinion that it would be impossible for the pilot to see the flagman, Little, once the pilot committed himself to flying under the wire. Obviously, from the very nature of crop-dusting, the flagman inevitably came within the "blind spot" and cannot be seen by the pilot as the plane approaches at the necessary low altitude and flies above them. (488 S.W.2d at 37, 38).
*1058 Although the case at bar has no "blind spot" aspect and appellee's witness Bob Walker testified that the visibility in a Piper Pawnee aircraft was better than normal, he also testified that a pilot in the situation faced by Chaney would mainly be looking out the side to check his altitude. Once he saw the first flagman start to move, he would then be looking at the second flagman and not at the first. It was testified to, without contradiction, that Chaney had seen Rubin Cannon start to move after Chaney had lined up on him. Further, in Riddell, supra, it was shown that the pilot had changed his "pattern" of flying on the pass when the flagman was hit. In the present case, no testimony indicated that this pass was any different from the other eleven or twelve passes already made in the field. Bob Walker testified that a pilot normally goes out and starts the field the way he is going to fly the entire field. In other words, there was no "adjustment period" to the field.
Uncontradicted testimony given at the trial was that Chaney was keeping the best "lookout" possible under the situation. Although violation of a statute is negligence per se, Wilburn v. Gordon, 209 Miss. 27, 45 So.2d 844 (1950), in order to rely on it, there must be a showing (such was not made here) that the statute was indeed violated. In the other cases cited by appellant in support of her contention, there was a clear and obvious violation of the statute in question.
Arguing that the negligence of the two appellees was established by uncontradicted evidence, appellant cites numerous cases on the duty to "keep a lookout" while operating an automobile. She claims that the duty is analogous to that of a pilot in an airplane as in this case. 8 Am.Jur.2d, Aviation, § 64 (p. 685); 8 Am.Jur.2d, Aviation, § 66 (p. 688).
Though pertinent in some respects, the automobile cases cited by appellant are not totally analogous to the case at bar. Riddell, supra, seems to sum up the problem in this case when it states:
To the contrary, it appears that the lookout maintained by Riddell was all that a reasonably careful pilot would or could observe in crop-dusting. He testified that he was looking at the ground and the border levee (where Little was standing) and out both sides of the plane and in all directions during this particular pass toward the flagman when the accident occurred. This testimony is uncontradicted. (253 Ark. 686, 488 S.W.2d at 37).
As in Riddell, the testimony as to what the pilot did is uncontradicted. Our view is that Chaney's testimony (though lacking words of tenderness) would tend to exonerate rather than condemn him as appellant claims. The testimony, in the light of the situation confronting him, shows that Chaney kept a lookout as best he could, and to the degree required of him. In judicially passing upon his actions, we must be mindful that Chaney was operating the plane through a "wire patch," watching his altitude, managing the spray mechanism, and piloting the plane so as not to strike the levee. It is difficult to imagine he could do all these things and continue to observe the actions of the flagman. Although he testified that he did not look at Rubin Cannon after lining up on him, he also testified that Rubin had started to move. The only other testimony on this subject was that of Bob Walker, who in essence stated that he would have done the same thing under similar circumstances.
Appellant in her rebuttal brief further states that appellees have placed the entire burden of avoiding the accident on Rubin Cannon and that appellees "boldly assert that the sole proximate cause of Rubin Cannon's death was his failure to get out of the path of the aircraft." This is not quite correct. We find no place in the record where appellees deny that they had a duty of care to Rubin Cannon. Their contentions are: they did not breach their duty; were not negligent; and did not violate the statutes. As to their "bold assertion," appellees' brief states:
The crux of this lawsuit was the proximate cause for the expected result not *1059 being completed. The jury determined that it was the sole, proximate result of Rubin Cannon unexpectedly only taking two steps instead of the prescribed 14 steps. (Emphasis added).
Their contention, then, is that the jury found the sole proximate cause of Rubin Cannon's death to be his failure to move.
Appellant cites Hughes v. Mississippi Power Company, 244 Miss. 326, 141 So.2d 539 (1962), which case focused upon the "duty which the aviator owes to the public in general." (Emphasis added) (244 Miss. at 332, 141 So.2d at 541). Hughes does not control the case at bar, because at the time of the accident Rubin's relation to the pilot was not as a "member of the general public;" between the two existed a significant co-ordinated team relationship.
Appellant's contention is that appellees' uncontradicted testimony clearly established negligence as a matter of law leaving no jury issue. Again, Riddell pertinently states:
We recognize that a pilot is liable for damages in accordance with the rules and law applicable to torts which occur on land. Ark.Stat.Ann. § 77-110 (1957 Repl.). However, we have held that it is error to submit to the jury the question of whether a proper lookout had been maintained when the only testimony on this issue is to the effect that it was kept. (253 Ark. 686, 488 S.W.2d at 38).
Whether the court should have directed a verdict for the defendants (appellees) at the close of the plaintiff's case is arguable. This is true because the only testimony directed to the issue of keeping a proper lookout is that Chaney kept such a lookout. Regardless of that, the trial judge after hearing the evidence presented by both sides, let the case go to the jury, and from that action appellees have not cross appealed.
The appellant asserts that the standard of care applicable to the defendant pilot was "increased because of the risk of the wire patch"  wires strung across and over the field. Argument is that the pilot's posture is much like that in Shurley v. Hoskins, 271 So.2d 439 (Miss. 1973) where the hunter fired his gun into the woods without first determining that no person was within the path of the discharged pellets. Analogy here is not present, because increased danger on account of the wires was mainly to the pilot and not to Rubin. The wires constituted a factor for the jury to consider along with all other evidence.
In her brief, appellant argued that appellees' Instruction D-13 was erroneously granted. Argument made is that the jurors "were left to grope and roam at large in search of measures" which the decedent could have taken, and further that "no guides were given to the jury" concerning what measures would be deemed proper and necessary. Also, argument focuses upon language in the instruction which authorized the jury to find the decedent negligent if he "without warning failed to remove himself" from the airplane's expected path. Also, appellant contends that D-13 was "faulty in placing upon decedent the burden of being charged with the sole proximate cause of the accident if he failed for any reason to remove himself from the path of the aircraft." Argument asserted here is not properly before us because at trial the objection made to D-13 was that it placed:
[A]n affirmative duty on the flagman, I think, is not good law. I still say that if he stood out there and stuck out his tongue and defied the airplane to hit him, it was the duty of the pilot driving the airplane to do whatever he could to avoid him.
Objection made below did not focus upon the matters now urged in accordance with our Supreme Court Rule No. 42. It is to be noted that Instruction P-5 granted at the appellant's request strongly advised the jury that the pilot of an airplane must "at all times be vigilant and anticipate the presence of persons and property on the ground... ." Another instruction submitted to the jury advised the jurors on the matter of comparative negligence of the flagman Rubin Cannon and pilot Chaney. We do not approve the language of Instruction D-13 *1060 as written but upon the record as made it does not warrant reversal.
Presented at the trial level was testimony showing that Rubin Cannon came to his untimely death in a tragically unfortunate accident. However, upon the evidence, the jury found that his death was not proximately caused by any negligence on the part of pilot Chaney. We are unable to say that the jury verdict and judgment appealed from should be reversed.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and COFER, JJ., concur.