**Amanda Hudson BECK, A Minor, by John H. CHAIN, Her Next Friend, Plaintiff-Appellant,**

v.

**Susan Leslie THOMPSON, Executrix of the Estate of James P. Thompson, Deceased, Defendant-Appellee.**

No. 86–4010.

United States Court of Appeals, Fifth Circuit.

June 11, 1987.

Thomas W. Tardy, Alex A. Alston, Jr., David A. Bowers, Jackson, Miss., Schmid, Ford, Mooney & Frederick, Omaha, Neb., for plaintiff-appellant.

Michael S. Allred, David A. Barfield, S. Craig Panter, Jackson, Miss., for defendant-appellee.

Before BROWN, RANDALL, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

James Thompson and Dr. Priscilla Chain Beck died when they were not rescued after Thompson's airplane crashed into the side of Mt. Graham, Arizona. Dr. Beck's daughter, Amanda Beck, filed this suit and now appeals from entry of an adverse judgment in favor of Thompson's Estate following a bench trial. Amanda contends that James Thompson breached his duty of care to her mother when he failed to have an authorized emergency locater transmitter on board his Piper Lance aircraft, when he failed to file a flight plan with the Federal Aviation Administration, when he failed to request flight following or to activate the aircraft's transponder, when he deviated from his planned flight course, and when he failed to request updated weather information during the course of the flight. She argues that these omissions and commission delayed rescue efforts, a delay that was a cause of her mother's death. The district court found no negligence on the part of Thompson. Because we cannot say on this record that the district court's findings were clearly erroneous, we affirm.

I

On December 20, 1979, Thompson, a non-instrument rated pilot, departed from Jackson, Mississippi, in his Piper Lance aircraft, N9877K, for a cross-country flight to Van Nuys, California, with planned stop-overs in San Antonio, Texas, and Phoenix, Arizona. The flight would take Thompson over several thousand miles, a significant portion of which would be flown at night, and over hazardous mountainous terrain in the middle of winter. Despite the length and conditions of this flight, Thompson did not file a flight plan with the Federal Aviation Authority, nor did he check the operation of the emergency locator transmitter [1] on board his aircraft on the day of his departure.

The ELT on board Thompson's aircraft contained lithium sulfur dioxide batteries which, pursuant to a February 1979 FAA Air Worthiness Directive, were required to be removed from ELT's. Aircraft containing lithium sulfur dioxide batteries were authorized to operate without ELT's until March 28, 1980, but were required to document such operation and to post a placard in the ship notifying the pilot of the absence of an authorized ELT. *See* 44 Fed. Reg. 50314, 50322. Thompson did not remove his lithium sulfur dioxide batteries and did not post notice of the absence of an authorized ELT on board the aircraft.

Thompson stopped that evening in San Antonio and had the plane serviced. Beck, a licensed pilot who had previously flown

---

**1.** An emergency locator transmitter is a small, battery-powered transmitter which emits a high-frequency signal that can be picked up by receivers in the vicinity. The ELT is activated automatically on impact or may be activated manually. The signal transmitted on radio frequency 121.5 allows rescuers to readily locate the site of a downed aircraft.

aircraft in the company of Thompson, boarded the plane there as planned. While in San Antonio, as in Jackson, Thompson failed to file a flight plan, failed to obtain a preflight weather briefing, and failed to activate the transponder[2] on board his plane. The aircraft left San Antonio on a visual flight rules flight to Phoenix at 6:22 p.m., M.S.T. It is not known whether Thompson or Beck was piloting the aircraft throughout the remainder of the flight.[3]

Contact with the El Paso Flight Service Station was made at 9:06 p.m., M.S.T., requesting weather information to Phoenix via El Paso-Deming-San Simon. No further visual or radio contacts are known to have been made with the aircraft. The plane crashed that night into the side of Mt. Graham with its fuselage intact. At the time of the accident, the plane was seventeen nautical miles off its intended course and 3,285 feet below the minimum safe altitude for flight over that region. The conditions at the time of the crash allowed visual flight, with a slight chance of light rime icing and marginal visual flight conditions. The only evidence produced at trial regarding the cause of the accident suggested that a build-up of ice particles in the plane's landing gear mechanism caused the accident by lowering the landing gear and reducing the plane's speed below stall levels.[4]

A ramp search was conducted at Safford Municipal Airport on December 21, 1979, when a family member informed the FAA that Thompson's plane failed to arrive in Phoenix. On the morning of December 22, two pilots made a systematic aerial search of Mt. Graham with their aircraft radio tuned to the ELT emergency frequency and flew within five hundred feet of the crash site. Because the downed plane's ELT was inoperable, these pilots did not find it. On December 23, the Rescue Coordination Center at Scott Air Force Base, Illinois, and the Civil Air Patrol initiated a full-scale search which extended as far as the California coast because the FAA had no idea where the downed aircraft was. This search was suspended on January 2, 1980. At trial, both parties stipulated that "if the batteries in the emergency locator transmitter (ELT) on board N9877K had not been in defective condition on December 20, 1979, Priscilla Chain Beck could have been rescued" because an operable ELT would have focused the search within one-half mile of the crash site.

Six months later, the wreckage of Thompson's Piper Lance was found on Mt. Graham. The remains of Beck were found about 125 feet from the plane near a small shelter. The remains of Thompson were found about two miles from the site. It is admitted that Beck survived the immediate crash, as did Thompson. Both parties died from hypothermia, a lowering of body temperature due to prolonged exposure to the cold.

Amanda Beck, by her next friend John Chain, filed this diversity suit against Susan Thompson, the executrix of the estate of Thompson, for the wrongful death of Priscilla Chain Beck. The United States District Court for the Southern District of Mississippi found that Mississippi law applied to this claim. After reviewing the evidence, the district court found that Thompson was guilty of no negligence, since he had neither violated a federal aviation regulation nor breached his duty to act as a reasonably prudent pilot under the circumstances.

II

A federal court sitting in diversity is bound to apply the law of the forum state, including that state's conflict of law rules.

---

2. A transponder is a radio device which assists in identifying aircraft and which also allows a FAA Flight Service Station to know the altitude and location of an aircraft at all times. Transponders are used primarily with flights conducted under instrument flight rules conditions.

3. Beck does not appeal the trial court's decision that it could not be determined whether Thompson or Beck was actually manipulating the controls of the aircraft at the instant of the accident.

4. The court did not determine the cause of the accident as it considered this finding unnecessary to its decision.

*Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed.2d 1477 (1941). In this case, therefore, we apply Mississippi conflict of law rules.

In *Mitchell v. Craft,* 211 So.2d 509, 515 (Miss.1968), the Mississippi Supreme Court adopted the "center of gravity" test, which requires applying the law of the state that has the most significant relationship to the events and parties, or that because of the relationship or contact with the events and parties, has the greatest concern with the specific issues regarding the liabilities and rights of the parties to the litigation. The district court also noted that "in a case of doubt, a court will naturally prefer the laws of its own state." *Id.* at 512.

■ Stated in terms significant to the choice of law issue, the child of Beck, a domiciliary of Texas, sues the estate of Thompson, a domiciliary of Mississippi, for an injury that occurred after a plane registered in Mississippi crashed in Arizona. Each of these three states has an interest in this suit. The district court, applying the conflict principles of the State of Mississippi, determined that Mississippi law applied. We are persuaded that this decision was correct.

Contrary to the assertions of the defendant at oral argument, the law of Arizona does not control. Arizona had no relationship with the claim apart from the fortuitous circumstance that the aircraft crashed there. Mississippi rejected the doctrine of *lex loci delicti* in *Mitchell* because its interests were not vindicated by such fortuity.

Whether the law of Texas or the law of Mississippi should govern is more problematic. Texas was not only the domicile of the decedent Beck, but was also the site at which Beck boarded Thompson's Piper Lance aircraft. Mississippi, on the other hand, was the domicile of Thompson, the state in which his aircraft was registered and rested, and the site from which this cross-country journey began. We are also informed in our inquiry by the policy of the Mississippi courts to apply the law of Mis-

sissippi in close cases. We think that to the extent the gravity of these events centered anywhere, it was Mississippi. We agree then that the district court was correct in choosing to apply Mississippi law.

### III

Negligence consists of proof by a preponderance of the evidence of: (1) a duty owed to the plaintiff, (2) breach of that duty by the defendant, (3) injury to the plaintiff caused by that breach, and (4) damage to the plaintiff. *Ward v. Hobart Manufacturing Co.,* 450 F.2d 1176, 1181 (5th Cir. 1971) (applying Mississippi law).

A district court's finding of negligence is subject to review under the clearly erroneous standard of Fed.R.Civ.P. 52(a). *Lidy v. Film Transit, Inc.,* 796 F.2d 103, 105 (5th Cir.1986). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

The plaintiff claims that Thompson violated federal aviation regulations and was therefore negligent per se. She also contends that Thompson breached his duty to act as a reasonably prudent pilot. We first address the allegations of negligence per se, and then treat the claims of common law negligence.

### A. Claims of Negligence Per Se

1. *Failure to have an operable ELT.* Although not the actual owner of his aircraft,[5] the district court found that Thompson was the pilot-in-command within the meaning of 14 C.F.R. § 91.3 and had therefore assumed certain duties apart from the actual manipulation of the aircraft. The plaintiff argues that Thompson breached these duties when he violated Federal Aviation Regulations by failing to remove an inoperable ELT and by failing to provide notice of the absence of an operable ELT

---

5. The aircraft was owned by Tri-Wells Aviation, Inc.

on board his aircraft. Because "violation of a regulatory or penal statute ... constitutes negligence per se and will support a cause of action" under Mississippi law, *Wilburn v. Gordon*, 209 Miss. 27, 45 So.2d 844 (1950), the plaintiff contends that the district court committed clear error in failing to find Thompson negligent. To establish negligence per se, the plaintiff must show (1) a violation of a regulation, (2) which causes the type of harm that the regulation was intended to prevent, and (3) which injures a member of the class of persons intended to be protected by the regulation. *Swoboda v. United States*, 662 F.2d 326, 329 (5th Cir.1981), *cert. denied*, 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982). Once negligence per se is shown, the plaintiff must still establish the causal relationship between the statutory violation and the harm to the plaintiff. *Haver v. Hinson*, 385 So.2d 605, 608 (Miss. 1980).

Miss.Code Ann. § 61–11–1 (1972) provides:

> It shall be unlawful for any person to operate an aircraft in the air or on the ground or water, ... in a careless or reckless manner so as to endanger the life or property of another. In any proceeding charging careless or reckless operation of aircraft in violation of this section, the court in determining whether the operation was careless or reckless shall consider the standards for safe operation of aircraft prescribed by federal statutes or regulations governing aeronautics.

This statute has been interpreted by the Mississippi courts to incorporate the federal safety statutes and regulations. *See Cannon v. Jones*, 377 So.2d 1055 (Miss. 1979) (analyzing alleged statutory violation in terms of FAA regulation § 137–49).

The plaintiff argues that Thompson's use of an unauthorized ELT violated 14 C.F.R. § 91.52, which provides:

> (b)(1) ... [T]here must be attached to the airplane an automatic type emergency locator transmitter that is in operable condition and meets the applicable requirements of TSO–C91....

> (f) Paragraphs (a) and (b) of this section do not apply to

> > (10) An aircraft during any period for which the transmitter has been temporarily removed for inspection, repair, modification or replacement, subject to the following

> > > (i) No person may operate the aircraft unless the aircraft records contain an entry which includes the date of initial removal, the make, model, serial number, and reason for removal of the transmitter, and a *placard is located in view of the pilot* to show "ELT not installed."

> > > (ii) No person may operate the aircraft more than ninety days after the ELT is initially removed from the aircraft.

Since the parties stipulated below that the ELT on board the Piper Lance was inoperable, the plaintiff argues that negligence per se is established, and she need not show more. The district court found that Thompson had violated no federal regulations and therefore rejected the plaintiff's claim of negligence per se.

■ *a. Violation of regulation.* Because ELT's with lithium sulfur dioxide batteries were suspect, FAA Airworthiness Directives issued in February and May of 1979 required that such ELT's be removed from aircraft. Thompson failed to remove his unauthorized ELT, but that alone does not give rise to negligence per se, as the February directive authorized operation of aircraft without operable ELT's for one-hundred-eighty days. This time period was extended by a directive issued on August 27, 1979, to allow operation of aircraft without ELT's until March 28, 1980.

The February directive, however, provided specifically that upon removal of the ELT from the aircraft and operation of the aircraft without an authorized ELT, there must be compliance with the record keeping and placarding requirements of § 91.-52(f)(10)(i). Thompson failed to do this. Thus, Thompson was in violation of § 91.-52(f)(10)(i), which requires documentation

and placarding when an aircraft is operated without such equipment.

The defendant argues that because general directives do not create specific duties, *see, e.g., King v. Avtech Aviation, Inc.*, 655 F.2d 77, 79 (5th Cir.1981), § 91.52 fails to establish a legal duty on aircraft operators to document and placard the absence of an authorized ELT. We are persuaded that § 91.52 is sufficiently specific to impose a duty upon aircraft operators to either equip their aircraft with an authorized ELT or to document the absence of such equipment. However, while the district court's finding of no regulatory violation was clear error, we are also persuaded the error was harmless.

b. *Cause of harm which the regulation intended to prevent.* The February directive was issued because lithium sulfur dioxide batteries, such as the one found in Thompson's ELT, proved to be a source of sulfur dioxide gas which forms sulfurous acid, a highly corrosive acid that can cause equipment failure. These batteries also vented violently, meaning that they experienced rapid uncontrolled discharges of harmful gases or liquids, or both, from one or more cells accompanied by the generation of heat. The regulation also noted that these batteries sometimes exploded, which could result in the loss of aircraft. The evidence at trial established that the ELT in Thompson's aircraft failed due to corrosion.

A directive issued August 27, 1979, adopted a new Technical Standard Order setting forth standards for lithium sulfur dioxide batteries to be used in aircraft. 44 Fed.Reg. 50314. The batteries used in Thompson's aircraft, however, were not formally approved until December 27, 1979, seven days after the accident. 45 Fed.Reg. 13051, 13052.

But the directive also permitted the operation of aircraft without an authorized ELT until March 1980. Accordingly, the district court noted that the directive did not seek to ensure that all aircraft flying before that date had operable ELT's and that the regulation could not be construed as in-

tending to prevent the harm that occurred here in 1979.

In so ruling, the plaintiff argues the district court failed to note that the directive went further to require that all aircraft lacking authorized ELT's contain a placard providing notice of that defect; that compliance with this requirement would have provided notice to Beck that the aircraft lacked this safety equipment.

Thompson's failure to post a placard violated this regulation. But this violation does not constitute negligence per se, since the federal regulation provided for notice to be placed *in the view of the pilot* and not passengers. The fact that Beck sat in the cockpit of Thompson's aircraft and would have seen a placard placed in the view of the pilot is fortuitous. The federal regulation does not require notice to all persons who board the aircraft and does not create a duty to warn of latent defects. Beck did not assert below a claim of negligence based upon a duty to warn, and we will not decide whether there was a claim for ordinary negligence.

■ 2. *Failure to test the ELT.* The plaintiff also contends that Thompson violated Federal Aviation Regulations §§ 91.-3(a), 91.9 and 91.52 by failing to test the ELT before embarking on this journey. We are persuaded that these sections are not specific enough to impose a duty on Thompson to test the ELT on the date of flight and therefore find no negligence per se.

Federal Aviation Regulation § 91.3(a) provides:

> The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.

In *Rimer v. Rockwell International Corporation*, 641 F.2d 450, 455 (6th Cir.1981), the district court found that the pilot's failure to check the security of the gas cap did not constitute negligence per se because § 91.3(a) provided only a general standard of conduct. It did not specifically require that the pilot inspect the gas cap. Similarly, this section cannot be construed to cre-

ate a duty on the part of Thompson to inspect the ELT on the date of flight.

Sections 91.9 and 91.52 are also too general to require such testing. Section 91.9 provides that: "No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another," 14 C.F.R. § 91.9; and § 91.52 requires the pilot to have an authorized ELT on board his aircraft. Although § 91.52 did impose upon Thompson the duty to have an authorized ELT on board the aircraft, which was suspended by FAA Airworthiness Directives, it did not require him to test that ELT before embarking on every flight. Rather, the federal aviation regulations required Thompson to test the ELT during the annual inspection of the aircraft. Thus, Thompson's failure to test the ELT on the date of the flight was not negligence per se.

■ 3. *Failure to provide de-icing equipment.* The plaintiff also argues that Thompson violated 14 C.F.R. § 91.209 by flying despite light rime icing conditions and was therefore negligent per se. Section 91.209(b)(2) prohibits a pilot from flying "[u]nder VFR into known light or moderate icing conditions; unless the aircraft has functioning de-icing or anti-icing equipment."

The district court did not enter a finding with respect to this issue because without speculating it could not determine the cause of the accident. Like the district court, we are persuaded that the plaintiff failed to carry the burden of persuasion with respect to the cause of the accident, and possible violation of this regulation was not relevant. That is, even if a statutory violation did occur, the plaintiff failed to show that this violation caused the harm suffered by Beck. The plaintiff's expert witness admitted that there was no evidence to suggest that the accident was caused by icing conditions which might have been prevented by the presence of such equipment.

## B. Common Law Negligence

The plaintiff next contends that whether or not Thompson violated a federal regulation, he violated his common law duty to act as a reasonably prudent pilot by failing to test the ELT on the day of departure, by failing to file a flight plan with the FAA, by failing to request flight following or to activate his aircraft's transponder, by failing to provide de-icing equipment on the aircraft, and by failing to request updated weather information during the course of the flight.[6] The district court found that despite the cumulative effect of these acts, Thompson had acted as a reasonably prudent pilot and denied liability.

Under Mississippi law, the question of whether a duty exists is a question of law to be determined by the trial court. But the question of the extent of that duty, or the appropriate standard of conduct to be applied, presents a mixed question of law and fact under both federal and Mississippi law. *See, e.g., Hobart Manufacturing Company,* 450 F.2d 1176, 1181 n. 15 (applying Mississippi law). The determination of whether Thompson's conduct conformed to the standard of a reasonably prudent pilot is a factual question. Findings of fact may not be set aside as clearly erroneous simply because the reviewing district court would give the evidence a different construction. *O'Malley v. United States Fidelity & Guaranty Co.,* 776 F.2d 494, 497 (5th Cir. 1985). "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Id.*

6. The dissent attempts to characterize the inquiry as a question of duty, rather than one of fact. In other words, the dissent asks if Thompson had a duty to test his ELT, rather than if his failure to test his ELT violated his duty to act as a reasonably prudent pilot. We reject this analysis. If we over parse the negligence inquiry, as the dissent would have us do, then practically all of the negligence inquiry would be a question of law. Our difference with the dissent in the main reflects distinct views of institutional roles. This is a close case and the evidence pushes hard against the district court's findings; but they were questions of fact and our disagreement with the district court does not mean its findings were clearly erroneous. And relatedly, our disagreement reflects the papers not the witnesses—an incomplete view, understood by the protective mantle of clearly erroneous.

■ 1. *Failure to test the ELT.* The district court recognized that compliance with a regulation or statute is not always sufficient to constitute the exercise of reasonable care. *Brunt v. Chicago Mill & Lumber Co.*, 243 Miss. 607, 139 So.2d 380, 383 (1962). The Mississippi Supreme Court stated in *Brunt* that:

> [A]pplication of ordinary rules of negligence to aviation fixes a greater degree of responsibility. The reason is obvious: the operation of an aircraft in a normal legal manner cannot be classified as negligence per se; nevertheless, the operation of an aircraft does call for a greater degree of care than the operation of an instrumentality which is incapable of inflicting serious injury.

*Id.* Compliance with minimum safety regulations does not excuse unreasonable conduct where a reasonable man would take additional precautions. *Dorsey v. Honda Motor Co.*, 655 F.2d 650, 656 (5th Cir.1981), *modified,* 670 F.2d 21, *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *see also Corley v. Gene Allen Air Service, Inc.*, 425 So.2d 781, 784 (La.Ct.App.1982).

Although plaintiff's expert witness testified that a reasonably prudent pilot would check the plane's ELT before embarking on a cross-country flight, the district court noted that the operation manual for the plane,[7] the applicable federal regulations, and even a book written by plaintiff's expert containing preflight and pretakeoff checklists did not require or recommend preflight testing of the ELT. The operation manual for the plane, the FAA regulations, and the expert's book were each written with *all* VFR flights in mind,[8] and none mentioned the testing of ELT's on the date of cross-country flights. A March 1979 Airworthiness ALERTS publication [9] did require testing of ELT's every ninety days, but the district court noted that there was no evidence that Thompson had failed to comply with this requirement.

The district court accepted the testimony of the defendant's expert witness, a former FAA safety inspector, that he saw no violation of good safety practices in not testing the ELT prior to takeoff. The district court found this testimony to be credible, as it conformed with the federal regulations, the FAA Airman's Information Manual, the operating manual for Thompson's plane, and the checklist found in the plaintiff expert's book—all of which focus upon pilot safety. Accordingly, the district court ruled that Thompson's failure to test the ELT on the date of departure did not constitute a breach of his duty to act as a reasonably prudent pilot. We cannot say this ruling was clearly erroneous.

2. *Remaining omissions.* The plaintiff also cites the failure to file a flight plan with the FAA, the failure to request flight following or to activate the plane's transponder, the failure to provide de-icing equipment, and the failure to request weather information as evidence of Thompson's negligence. The district court found that Thompson did not act unreasonably in omitting such precautions, largely because they were not required by federal regulations or statute and because they were not helpful in the main.

■ a. *Failure to file a flight plan.* The district court found that Thompson had no duty to file a flight plan with the FAA, since no federal aviation regulation required such filings in connection with visual flight rules flights. Indeed, even the

---

**7.** The FAA Airman's Information Manual is also evidence of the standard of care among all pilots. *In Re N–500L Cases,* 691 F.2d 15, 28 (1st Cir.1982). This manual refers pilots to the preflight checklist provided in the aircraft's owner manual, which the court noted did not suggest preflight testing of the ELT.

**8.** The dissent argues from this fact that the operation manual, the FAA regulations, and the expert's book state only the minimum requirements applicable to "Saturday afternoon flights." This is not necessarily the case. Each was written with the knowledge that extended flights are common. None suggested anything more than their respective preflight checklists was necessary for extended flights. We do not think the district court was clearly erroneous in relying upon these safety guidelines when evaluating Thompson's conduct.

**9.** This directive was superseded by a directive issued in May 1979.

plaintiff's expert witness acknowledged that most pilots flying under VFR conditions do not do so. The district court also found that, in any event, the failure to file a flight plan did not cause the death of Beck. Because we are persuaded that the district court's finding of no causation is not clearly erroneous, we need not address the question of duty.

The district court noted that since Thompson and Beck deviated from the planned course of flight, "the filing of a flight plan would not have made the location of the crash site more likely." Although the plaintiff argues that the flight plan would have focused the search within seventeen miles of the crash site and obviated the search of the California coast, both parties stipulated at trial that Mt. Graham was within the primary search area. The district court is correct that the rescue efforts would have been led astray by the filing of a plan, focusing efforts seventeen miles away.

■ b. *Failure to request flight following and to activate his transponder.* The plaintiff also argues that Thompson's failure to request flight following and to activate his transponder was a breach of his duty to act as a reasonably prudent pilot. However, neither action was required by the federal regulations. Moreover, both parties' expert witnesses testified that requests for flight following by aircrafts flying under visual flight rules are given low priority by the air traffic controllers. Consequently, defendant's expert stated that pilots rarely request flight following under those circumstances.

The plaintiff produced evidence, and the dissent notes, that flight following was in fact available to aircraft flying under visual flight rules the night of December 20 in the El Paso area. This evidence, however, touches upon the issue of causation and not breach of duty. The district court found that it was reasonable to proceed under visual flight rules without requesting flight following because such services were rarely available.

Defendant's expert also testified that the signal transmitted by the transponder is often not received in mountainous terrain such as Mt. Graham. Thus, the district court found that it was not unreasonable to proceed through this region without activating the transponder, since this action would most likely be futile. While we might disagree with the district court's view of the evidence in this instance, we cannot say that it is clearly erroneous.

c. *Failure to provide de-icing equipment.* The plaintiff argues Thompson's failure to provide de-icing equipment was further evidence of his negligence. As we stated earlier, the district court did not touch upon this issue in its opinion. However, because there was no evidence to suggest that sheet icing conditions caused the accident, we are persuaded that the plaintiff cannot recover on this alleged ground of negligence.

■ d. *Failure to obtain current weather information.* Finally, the plaintiff argues that Thompson breached his duty to act as a reasonably prudent pilot by failing to maintain awareness of the weather conditions. The evidence established that Thompson obtained weather information from the El Paso Flight Service Station at 9:06 p.m., M.S.T. The district court also noted that several automated weather services were available and that Beck had failed to prove that Thompson had not used these services.

Plaintiff's expert meteorologist testified that the conditions at the time of the flight allowed visual flight rules flight, with a slight chance of marginal conditions, and admitted that it was reasonable for Thompson to continue the flight based upon the weather information received from El Paso at 9:06 p.m., M.S.T. Both parties' expert witnesses testified that a pilot should get weather information every hour when the weather is marginal. Since weather information is updated hourly by the FAA, it would serve little purpose to request information more frequently. Moreover, because there is no record of the use of automated weather services, the plaintiff could not prove that Thompson had failed to obtain weather information as required. Accordingly, the district court ruled that

the plaintiff had failed to prove that Thompson had acted unreasonably.[10] We do not find clear error.

## IV

■ The plaintiff next contends that Thompson was grossly negligent in intentionally deviating from his planned course of flight, in failing to notify the FAA of his deviation, and in failing to maintain proper altitude. Beck's arguments regarding the deviation in course must fail for two reasons. First, given the lack of evidence, it cannot be shown who was piloting the plane at the time of the deviation. Second, and more important, there is no evidence in the record to support a finding of intentional deviation. If the deviation from the course was unintentional, then no duty to notify the FAA of the deviation could have been invoked.

■ The argument regarding maintenance of proper altitude must also fail. The evidence simply failed to establish that this was the case. Plaintiff's expert witnesses admitted that there was no way of knowing if the plane was ascending or descending as it came upon Mt. Graham. The only evidence produced at trial regarding the cause of the accident suggested that an accumulation of ice particles activated the landing gear mechanism and caused a drop in altitude. We cannot say on this record that the district court's finding of no negligence was clearly erroneous.

## V

Beck also argues that even if the individual omissions and commission were not negligent by themselves, the cumulative result of Thompson's failure to take these safety precautions was negligence. However, a finding of negligence is one of fact to be reviewed under Fed.R.Civ.P. 52(a). That this court might have reached a con-

trary result as a trier of fact does not allow a finding of clear error.

## VI

Finally, the plaintiff argues that Thompson, as pilot-in-command of the Piper Lance, is vicariously liable for any negligent acts of Beck in piloting the ship. The Mississippi legislature has provided that:

> Any person who causes or authorizes the operation of aircraft, whether with or without the right of legal control (in the capacity of owner, lessee, or otherwise) of the aircraft, shall be deemed to be engaged in the operation of aircraft within the meaning of the statutes of this state....

Miss.Code Ann. § 61–1–3(j) (1972). The plaintiff argues that this statute authorizes vicarious liability, and that the words "or otherwise" contemplate pilots-in-command. Consequently, Thompson is liable for the manipulation of the plane regardless of whether he was the actual pilot or authorized Beck to fly the plane. The plaintiff thus contends that since the defendant is liable in the first instance in either event, the defendant can escape liability only by showing that Beck was contributorily negligent.

The district court rejected this theory of vicarious liability. Whether or not we believe this conclusion was correct, the fact remains that the plaintiff failed to establish negligent manipulation of the plane at trial. The asserted grounds of negligence—failure to file a flight plan, failure to request flight following and to activate the transponder, failure to request current weather information, failure to maintain proper altitude, and deviation from the planned course—were all properly rejected by the trial court. Other allegations of negligent manipulation—flying at night over this terrain, failing to have sufficient fuel, and the like—were not supported by the evidence. Because the fact of a crash does not estab-

---

10. The plaintiff argues that Thompson, as pilot-in-command, violated 14 C.F.R. § 91.5 which requires the pilot to familiarize himself with weather conditions and was therefore negligent per se. However, the evidence failed to establish that Thompson did not make use of auto-

mated weather services in full compliance with this regulation and there was no evidence to suggest that poor weather conditions were a cause of the crash. Thus, the plaintiff cannot recover under this claim.

lish negligence per se, *Foss v. United States*, 623 F.2d 104, 107 (9th Cir.1980), we are persuaded that there was no basis for vicarious liability in this instance.

## VII

The judgment of the district court is AFFIRMED.

JOHN R. BROWN, Circuit Judge, dissenting.

Following my review of the evidence presented to the trial court through live testimony and deposition testimony, I am left with the firm conviction that the trial court committed clear error and should be reversed because it analyzed Thompson's conduct against that of a reasonably prudent pilot under dissimilar circumstances.

The District Court held that VFR conditions constituted the same or similar circumstances to Thompson's flight. Thompson's conduct should have been contrasted to that of a reasonably prudent pilot under the circumstances of a cross-country, mid-winter, VFR, nightime flight across hazardous terrain and mountains. Additionally, I read the District Court's finding of no common law negligence as a circular path of reasoning which leads right back to its negligence *per se* analysis—that a reason-

able pilot complies with the Federal Aviation Regulations and since Thompson did not violate any regulations, he was not negligent.

The parties stipulated not only that the ELT was inoperable on the day of the flight, but also to the causal relationship between Thompson embarking on the Mississippi to California flight with an inoperable ELT and Beck's death. Stipulation No. 55 states "if the batteries in the emergency locator transmitter (ELT) on board N9877K had not been defective, Beck could have been rescued." [1] The District Court's opinion reflects that it found Thompson was under no duty to test the ELT,[2] request flight following or activate the transponder,[3] or file a flight plan.[4]

### A Mixed Question

The Court relies entirely on F.R.Civ.P. 52(a) in reviewing the District Court's finding of no negligence by Thompson as a finding of fact. However, negligence presents the Court with a mixed question of law and fact. "[W]hether a defendant owes a plaintiff a legal duty is a question of law while resolution of a defendant's possible breach of duty is a question of fact." *Welch v. Heat Research Corp.*, 644 F.2d 487, 489 (5th Cir.1981); *Chavez v.*

---

1. At trial and in post-trial briefs the parties disputed whether the term "rescued" in this stipulation means that she would have survived or merely that a rescue team would have reached the site earlier. As Judge Lee stated from the bench, "a stipulation ... shouldn't be something that I've got to start interpreting to decide what you mean by it, something that says one thing and [means] something else that appears to be contradictory. That's just not worth a hoot as a stipulation as far as the court is concerned."

   I also agree with Judge Lee's further statements that there can only be one interpretation to Stipulation 55 and that is one of survivability.

2. Regarding a duty to check the ELT, the District Court held:

   Mere compliance with applicable regulations, however, may not alone absolve Thompson of liability. Plaintiff contends, supported by her expert witness, ... that a reasonably prudent pilot would check the plane's ELT prior to flight. Such a timely check would have disclosed the faulty ELT. The operation guide for the plane, applicable federal regulations, and even [plaintiff's expert's] book ... do not

require or recommend testing of the ELT. Accordingly, this court is of the opinion that Thompson did not breach a duty in failing to test the ELT or in having an inoperable ELT on board.

   *Beck v. Thompson,* C.A. No. J83–0163(L), slip op. at 8 (S.D.Miss. Dec. 13, 1985).

   Although the court uses "breach of duty" language, it is clear from the context that in holding that Thompson breached no duty by not testing the ELT or having an operable ELT on board, he concluded Thompson had no duty to test his ELT or have an operable ELT on board.

3. Regarding the use of a transponder and flight following the District Court held:

   [T]his court is of the opinion that Thompson was not negligent in failing to request flight following or in failing to activate the transponder in that he had no duty to do so. *Id.* at 10.

4. Similarly, the District Court held that "Thompson had no duty to file a flight plan under the circumstances." *Id.*

*Noble Drilling Corp.,* 567 F.2d 287, 289 (5th Cir.1978).

In *Ward v. Hobart Manufacturing Co.,* 450 F.2d 1176, 1181 n. 15 (5th Cir.1971), which the majority relies on, the Court observed that "the question of the extent of that duty, or the appropriate standard of conduct to be applied seems to be a mixed question of law and fact." We identified the difficult distinction between law and fact questions in negligence cases in *Waterbury v. Byron Jackson, Inc.,* 576 F.2d 1095, 1097 (5th Cir.1978):

Establishing negligence is ordinarily a mixed question of law and fact. The determination of the standard of care to which the defendant must be held is a question of law, although its legal formulation is guided by proved facts. Deciding whether the defendant adhered to that standard is then a pure question of fact.[5]

This Court did not ford the Serbonian bog of mixed questions of law and fact[6] as it determined that the lower court was clearly erroneous.

### One Mile and Clear of Clouds

The error by the District Court was not the factual question of whether Thompson breached the standard of care, but was the legal question of what was the standard of care. The standard of care to which Thompson must be held is that of a reasonably prudent pilot under *like circumstances.* Both this Court and the District Court erroneously adopted the defendant's position that the circumstances of this flight are embodied entirely in the fact that it was a VFR flight.

Ms. Wally Funk, the NTSB Air Safety Investigator whose deposition was introduced by the defendant, testified that Visual Flight Rules permit pilots to fly in a seen-and-be-seen environment. Pilots are prohibited from flying VFR any time visibility is less than a prescribed minimum, depending on altitude and airspace restrictions.[7] The circumstances of designating a flight as taking place under VFR conditions are predominantly a question of visibility; they do not take into account any other specific circumstances of a particular flight such as the distance of the flight, the terrain over which the flight will cross, or whether the flight is during the day or night.

The Court's sole reliance on VFR conditions to constitute the same or similar circumstances takes only visibility into consideration and would require the same conduct of a pilot taking a one-hour Saturday afternoon flight around Jackson, Mississippi as it would of a pilot taking a cross-country trip of several thousand miles. The VFR regulations upon which the trial Court and the majority rely constitute a minimum safety regulation for all types of VFR flights and fails to consider the additional precautions that a reasonably prudent pilot would and should take advantage of in a long distance VFR flight under more difficult circumstances. "Unreasonable conduct is not an excuse when one merely complies with minimum regulatory requirements." *Corley v. Gene Allen Air*

---

5. In reviewing negligence questions, the Ninth Circuit abides by these same standards—which differs from the dicta in *Ward.* "The existence *and extent* of a duty of care are questions of law but whether such a duty has been breached and whether proximate cause exists are questions for the fact finder, whose determination is binding on appeal unless clearly erroneous." *Armstrong v. United States,* 756 F.2d 1407 (9th Cir. 1985) (emphasis added), citing *Foss v. United States,* 623 F.2d 104 (9th Cir.1980).

6. Today we cannot avoid "the Serbonian bog which appears to encircle ... a mixed question of fact and law." *Junior v. Texaco, Inc.,* 688 F.2d 377, 379 (5th Cir.1982); J. Milton, *Paradise Lost* 592 (1667) ("A gulf profound as that Serbo-

nian bog Betwixt Damiata and Mount Casius/old where Armies whole have sunk").

7. 14 C.F.R. § 91.105 provides that "no person may operate an aircraft when the flight visibility is less, or the distance from clouds is less, than that prescribed for the corresponding altitude in the following table...." The table requires flights such as Thompson's which are more than 1,200 feet above the surface, but less than 10,000 feet mean sea level and outside controlled airspace, to have one mile visibility and maintain a distance from clouds of 500 feet below, 1,000 feet above, and 2,000 feet horizontal. Section 91.107(d) requires three miles visibility to take off or land an aircraft under VFR conditions.

*Service,* 425 So.2d 781, 784 (La.App.1982) (reversing summary judgment of no negligence in allowing decedents to use plane without an E.L.T. even though not required on that plane by the Federal Aviation Regulations).

The District Court's error in determining Thompson's duty under like circumstances is itself sufficient grounds to reverse the District Court's factual finding of whether Thompson breached his duty to Beck for new findings of fact under the correct legal standard. *Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66, 79 (1982). As we have long held, fact findings made under an erroneous legal principle are not protected by the clearly erroneous standard of F.R.Civ.P. 52(a). I would go farther. Even assuming the legal standard of care is proper, I would still reverse on the grounds that the District Court's conclusion that Thompson breached no duty by failing to equip his plane with an operable ELT or to request flight following is clearly erroneous under F.R.Civ.P. 52(a).

### A Holding Pattern Over Negligence Per Se

I agree with the majority's determination that there is no negligence *per se* in this case because of the unusual situation that the Airworthiness Directive suspended 14 C.F.R. § 91.52, which required an operational ELT on Thompson's plane. If this fatal flight occurred prior to the Airworthiness Directive or after its expiration on March 28, 1980, negligence *per se* would clearly exist. Compliance with the regulations does not establish reasonable conduct by Thompson. The regulation required ELT's as a minimum safety regulation. The regulation was not suspended because ELT's were no longer considered a reasonable safety precaution, but was temporarily suspended to devise proper technical specifications for their batteries. The record reflects that the technical difficulties with the ELT batteries were widely known in the pilot community. Suspending the enforcement of § 91.52 in no way alters the pilots duty to undertake reasonable safety precautions appropriate to the circumstances of the flight on which he/she is about to embark. It is inconceivable to me—and the majority cites no reasons why the trial judge was not forced to the same conclusion—that any pilot could depart Mississippi with the intention of flying to California during the winter months without ascertaining whether his ELT was in operating condition, especially in light of the wide publicity within the pilot community of the difficulties with ELT batteries such as those in Thompson's craft. The existence of the regulation does not eliminate the law's demand that conduct be reasonable or the obligation of the fact finder to so declare when the facts are so compelling as they are here.

### Preflight Testing of the ELT

The majority opinion upholds the District Court's misplaced emphasis on the cross-examination of the plaintiff's expert witness—which also emanates from equating all VFR flights as taking place under like circumstances. Plaintiff's expert witness testified that a reasonably prudent pilot would check the plane's ELT before embarking on a cross-country flight. The majority states, "the District Court noted that the operation manual for the plane, the applicable federal regulations, and even a book written by the plaintiff's expert containing preflight and pre-takeoff checklists did not require or recommend preflight testing of the ELT ... and the defendant's expert witness saw no violation of good safety practices in not testing the ELT prior to takeoff." However, the Court failed to take into consideration that the operation manual for the plane, the applicable federal regulations, and the book written by the plaintiff's expert refer to all VFR flights, including the Saturday afternoon flight around Jackson, Mississippi. Evidence was offered at trial that a pilot should undertake additional safety precautions beyond those minimums for extended flights over dangerous or remote terrain.

The majority requires a pilot to tailor his conduct based solely on visibility and disregards other factors which influence a VFR flight. The defendant's expert, Glenn

Ellis, testified that he tested the ELT on his plane once a week and made a point of always testing it before any flight which would take him over the Atlantic Ocean outside of gliding distance to shore so that he could "get picked up out of a life vest or a life jacket if [he] went into the sea." I cannot read this testimony in such a way that it would permit the trial Court to plausibly conclude that Thompson acted in a reasonably prudent manner in not testing his ELT prior to undertaking a flight from Mississippi to California in the middle of winter. Although Ellis testified that ELT's are normally tested only at the annual inspection and that he saw no failure of good practices among pilots in failing to conduct a test or inspection of the ELT before taking off on a cross-country flight, Ellis summed up the entire tenor of his testimony by his statement that he knew reasonably prudent pilots that did not take advantage of readily accessible safety precautions and he also knew of reasonably prudent pilots who did. He concluded that more reasonably prudent pilots did not take advantage of these precautions than the amount of reasonably prudent pilots who did.

Reasonable conduct under the same or similar circumstances is not measured by the conduct of the majority of people in the same position as the plaintiff. The fact that the majority of pilots act in an unreasonable manner does not make their conduct reasonable[8] nor must the conduct of any one pilot be used as the standard of reasonableness.[9] Ellis testified about the conduct of individual pilots and not of the

mythical man of legal fiction—the reasonably prudent person. This is a critical error of law which deprives his findings of any legal vitality.

Two precautions which were readily available to Thompson, and for which a causal relationship to Beck's demise exists,[10] are the ELT and flight following. The defendant's expert testified that the first five minutes of each hour are designated as a testing period for ELT's.[11] The pilot can accomplish this by turning on the ELT and tuning his radio to the emergency frequency to listen for the ELT's transmission. On a cost benefit analysis, when one considers the cost of testing the ELT prior to a difficult cross-country flight against the benefits, it can hardly be said that the trial Judge could conclude that a reasonable person would not take advantage of this extra insurance of being rescued in the case of a crash.

The other safety feature which Thompson failed to utilize was a transponder with flight following.[12] Flight following of VFR flights, without question, is lower priority traffic for air traffic controllers than IFR flights. Thus, a pilot would have reason to believe that the air traffic controllers might not be able to dedicate sufficient time to provide flight following during high traffic times. The evidence demonstrated the traffic was, and usually is, extremely light near Mount Graham at 10:00 p.m. In fact, radar printouts showed two VFR flights were being provided with flight following in that sector at the time Thompson attempted his flight, one of them was fol-

---

8. "What ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." *Texas & Pacific Ry. Co. v. Behymer,* 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905, 906 (1903). *See also B & B Insulation, Inc. v. Occupational Safety and Health Review Commission,* 583 F.2d 1364 (5th Cir.1978).

9. The Reasonably Prudent Person is "a personification of a community ideal of reasonable behavior, determined by the jury's social judgment" and not by the conduct of any one individual. *Prosser & Keeton on Torts* § 32 at 175 (5th ed. 1984). Yet evidence of similarly situated individuals' conduct may be probative. *B & B Insulation,* 583 F.2d at 1370.

10. *See supra* note 1.

11. The parties stipulated that Thompson departed Jackson, Mississippi at 12:15 p.m. He surely would have been in his airplane during the ELT testing period.

12. Thompson's plane was equipped with a transponder that merely needed to be turned to the on position followed by a radio call requesting flight following. In exchange for this minor effort, the air traffic controller would have kept Thompson up-to-date on any weather systems in the area and any obstacles such as other planes or mountainous terrain in his path.

lowed until it landed at Stafford's airport near the base of Mount Graham.

Although, on cross-examination, the plaintiff's expert agreed with the defendant's expert that the great majority of VFR flights do not use either flight plans or flight following service. He explained this by stating "[w]hen we're saying the great majority of these flights, we're talking about an awful lot of flights that are five, ten, fifteen minutes in length over inhabited areas during the daytime, non-mountainous terrain.... [But in the case of l]engthy VFR flights, flights through terminal areas, flights over mountainous terrain at night and midwinter: I would say there's a great majority of those flights that use the flight following service." The NTSB Safety Inspector testified that "[a] prudent pilot would use [a transponder]. It's a form of insurance." This testimony amplifies the trial judge's error in law and fact of failing to distinguish between circumstances of VFR flights other than visibility.

Conceding that in our appellate role the majority opinion properly states that it might disagree with the District Court's view of the evidence in this instance, but cannot say it is clearly erroneous, I do not have the same difficulty.

The clearly erroneous standard of F.R. Civ.P. 52(a) extends great deference to the District Court's findings of fact. It is not an insurmountable deference, however. If the appellate court reviews the evidence at trial and determines that there are two plausible conclusions which one could reach from that evidence, it must affirm the District Court's finding of fact. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). On the other hand, equally well established, and in no way imperiled by *Anderson*, is the Supreme Court's declaration that even if the appellate court finds sufficient evidence to support the district court's finding of fact, but on the entire evidence is left with the definite and firm conviction that a mistake has been committed, the district court's finding of fact is clearly erroneous and must be reversed. *United States v. U.S.*

*Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). *See also Lidy v. Film Transit, Inc.*, 796 F.2d 103, 105 (5th Cir. 1986); *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980).

My meticulous review of the trial transcript, including the deposition testimony before the trial Court, reveals evidence which supports the District Court's conclusion only if one equates a fifteen-minute VFR flight around Jackson, Mississippi with a cross-country midwinter flight from Mississippi to California at night as constituting the same or similar circumstances. I am of the very definite opinion that this is not only an improper standard by which to analyze the conduct of a reasonably prudent pilot in this case, but this error of law denies the protection of F.R.Civ.P. 52(a) to the fact findings induced by it.

The trial Court was wrong in entering judgment for the Defendant and this Court is wrong in not reversing either for rendition or new trial.

I therefore respectfully dissent.